Nick Nechi, Licensee of the Premises at 1121 W. Wilson Avenue, Chicago, Illinois, Plaintiff-Appellee, v. Richard J. Daley, Local Liquor Control Commissioner, and the License Appeal Commission, A. L. Cronin, Chairman, Defendants-Appellants.

Gen. No. 48,809.

First District, Second Division.

January 29, 1963.

John C. Melaniphy, Corporation Counsel, of Chicago (Sydney R. Drebin and Marsile J. Hughes, Assistant Corporation Counsel, of counsel), for appellants.

Julius Lucius Echeles, of Chicago, for appellee.

MR. JUSTICE FRIEND delivered the opinion of the court:

Plaintiff Nick Nechi, licensee of a tavern at 1121 West Wilson Avenue in Chicago, filed a statutory action under the Administrative Review Act (Ill Rev Stats 1961, c 110, §§ 264–279), as provided in sections 8 and 8b of article VII of the Liquor Control Act (Ill Rev Stats 1961, c 43, §§ 153 and 154a), to review the administrative orders of the local liquor control commissioner and the license appeal commission. The mayor, as local liquor control commissioner, instituted proceedings for the revocation of Nechi's liquor license. On December 14, 1961, he was served with notice that a hearing of the charges against him would be held on December 18, 1961. The hearing was conducted by John F. Cashen, Jr., as deputy local liquor control commissioner. Nechi appeared personally and was represented by counsel; his attorney was afforded full opportunity to participate in the hearing. The commissioner revoked Nechi's Chicago retail liquor dealer's license. Nechi appealed the order to the license appeal commission which affirmed the commissioner's action by finding:

■■■■■■

"(A) That the Mayor, as Liquor Control Commissioner, has proceeded in the manner provided by law.

"(B) That the Order of Revocation is supported by the Findings.

"(C) That the Findings, namely: 'That on November 5, 1961, during an altercation on the licensed premises, Nick Nechi, the licensee, fatally shot and killed one Eugene Kimbrell, a patron on said premises, in violation of the Statutes of the State of Illinois.' are supported by substantial evidence in the light of of the whole record."

Plaintiff asked the trial court to review the record, and to reverse the orders of the local commissioner and of the commission as being contrary to law and to the manifest weight of the evidence, and wholly unsupported by any substantial evidence. The trial judge, adopting the interpretation urged by plaintiff, reversed and vacated the revocation order of the local commissioner, and likewise reversed and vacated the order of the license appeal commission sustaining the action of the local commissioner. Defendants appeal.

The facts disclose that on November 5, 1961 Nick Nechi, licensee of the tavern in question under a retail liquor dealer's license issued by the City of Chicago, shot and killed a patron on the licensed premises. The victim, Eugene Kimbrell, was thirty-three, married, and the father of one child, a nine-year-old boy. He had lived in Chicago for seven years, and for the last two years had worked as a machinist for Cummings Corporation. He had no police or felony record.

Kimbrell and Guthor Lindsey left the latter's home about six o'clock Saturday night, November 4, 1961,

and first went to the Silver Moon Tavern where they remained until about nine-thirty, each drinking about six bottles of beer. Leaving there, they went together to the Patrick Henry Tavern, Nechi's licensed premises, arriving there between nine-thirty and ten. On their arrival, Nechi spoke to Lindsey but not to Kimbrell. The tavern was crowded, and since there were no available seats Kimbrell and Lindsey stood at the bar while they drank four or five beers. They next went to the Cafe Berlin, arriving there about one o'clock Sunday morning, November 5, 1961. After drinking one beer there, they returned to the Patrick Henry. Going to and returning from the Cafe Berlin, they rode in an automobile driven by Powell Ernest. Back at the Patrick Henry they had two more beers; by then the count was thirteen or fourteen beers for each of them. Lindsey and Kimbrell became separated when Kimbrell left with Ernest and another patron to go to a tavern on Clark Street, while Lindsey went out to get a sandwich. After having eaten, he returned to the Patrick Henry about three twenty-five. Kimbrell and his companions had already come back to the Patrick Henry, and were standing along the wall while they drank beer.

A fight broke out in the tavern between one Wilcut and an unidentified person. Nechi stopped the fight and ejected the participants from the tavern. Although Kimbrell had apparently not been involved in the fight, plaintiff also requested him to leave and not return. Lindsey told the group he was with that he was going to go with Kimbrell.

Kimbrell and Lindsey left the tavern and started to walk west on Wilson Avenue. When they had reached a point about one-half block west of the licensed premises, someone in front of the tavern called to Kimbrell to come back. He went back alone, and Nechi compelled him, at gun point, to go into the tavern, and forced him, still at gun point, to march through the

crowded premises to a small office at the rear of the tavern. Within the next two or three minutes Nechi had shot and killed Kimbrell; a police officer testified Kimbrell was lying on his stomach, on his right cheek, within a pool of blood. Beside him there was an open knife with a two-inch blade. No finger prints were found on the knife. Nechi did not testify, nor did he call any witnesses on his behalf.

By way of justification, Nechi claims that he killed Kimbrell in self-defense, and that the coroner's jury, at the inquest held the day after the shooting, voted that the killing was justifiable homicide. Plaintiff bases his contention of justification and self-defense upon the statements of four police officers who appeared in his tavern shortly after the shooting. Their testimony was substantially to the effect that when they arrived Nechi told them that, during an argument, in self-defense he shot Kimbrell who lunged at him with a knife while Nechi was telephoning the police. He had the gun which was admittedly his, and turned it over to the police. The police were testifying as to what Nechi said to them, not vouching for Nechi's veracity. Nechi, who was present and represented by counsel at the hearing before the commissioner, was in a position to confirm under oath the testimony of the police officers, but failed to do so. "It is well settled that the failure of a party to a suit to produce evidence available to him gives rise to a presumption against him." Tepper v. Campo, 398 Ill 496, 505, 76 NE2d 490 (1948).

As against the foregoing evidence, the testimony of eyewitnesses Guthor Lindsey and Elmer and Betty Kassinger indicates that the victim Kimbrell committed no crime or violation of law in their presence which would seem to justify Nechi's apprehension of Kimbrell. Police Sergeant Ingham testified that Nechi told him that there had been a fight in the tavern prior to the shooting and "that at some point in the

fight this deceased had been at the rear of Mr. Nechi, standing at his back with an open knife, and when Mr. Nechi was aware of that fact, he told me he got a revolver from behind the bar, and he got this—the deceased—that is, he got to the deceased and made him go into the rear room of the tavern to hold him while he called the police." This testimony cannot be reconciled with the undisputed fact that Nechi had ordered the deceased out of the tavern after the fight was over, that Kimbrell left as directed, peacefully, that after leaving the tavern he had walked at least half a block with his friend Lindsey when he was called back and, at gun point, was forced by Nechi to enter the tavern and then, still at gun point, marched through the crowded premises by Nechi to an office at the rear of the tavern. Lindsey testified that he overheard Kimbrell ask Nechi why he was being ordered to leave the tavern and not return, and that Nechi replied that he didn't like to see a fellow kicked while he was down. Nechi must have meant, Lindsey reasoned, that Kimbrell kicked the fellow while he was fighting; but Lindsey himself, who was in the rear, did not see any kicking. In his brief, Nechi's counsel maintains that Nechi clearly had a right to make a citizen's arrest of Kimbrell, either because Nechi had seen Kimbrell kick a man in the tavern while the man was down, or because Nechi realized that Kimbrell was standing behind him with an open knife while he was trying to break up the fight. Nechi is willing to adopt either reason as justification for his conduct. But he offers no explanation of his enigmatic conduct in first ordering Kimbrell to leave the tavern and a few minutes later forcing him to return at gun point; no explanation as to why, in an alleged scuffle between him and Kimbrell, which no one witnessed, it was necessary for him to fatally shoot a "little guy," five feet seven, weighing one hundred forty pounds and "carrying" more than

twenty-six glasses of beer. Moreover, if Nechi was apprehensive of Kimbrell, it seems strange indeed that he wanted to be alone with him in a small office in the back of his tavern; one would suppose Nechi would ask someone to call the police while he, Nechi, was holding Kimbrell.

Although the question of Kimbrell's sobriety was not directly at issue, it should be noted that he and Lindsey had been drinking steadily from six o'clock Saturday night until after three Sunday morning. They had six bottles of beer at the Silver Moon Tavern, then four or five bottles at Nechi's Patrick Henry Tavern, one beer at Cafe Berlin, two more beers at Nechi's on their second stop about one in the morning. Lindsey was not with Kimbrell when he left with other companions to go to a tavern on Clark Street, but when Lindsey came back for a third time to Nechi's, about three twenty-five, Kimbrell and his friends had already returned and were standing along the wall while they drank beer. Thus, in the course of the evening, Kimbrell had had an aggregate of more than thirteen bottles—or twenty-six glasses. Section 131 of the Dram Shop Act (Ill Rev Stats 1961, c 43) provides that "no licensee nor any officer, associate, member, representative, agent or employee of such licensee shall sell, give or deliver alcoholic liquor . . . to any intoxicated person . . . ." In the recent case of Nystrom v. Bub, 36 Ill App2d 333, 184 NE2d 273 (1962), the plaintiff alleged that the defendant tavern operators sold to a patron, one Burroughs, alcoholic liquor which caused, in whole or in part, his intoxication, and that while so intoxicated as a result of the consumption of such alcoholic liquors he drove his automobile in a drunken manner and so collided with a car driven by the plaintiff, who sustained injuries as the result of the collision. Burroughs had had, at the most, three cans of beer in the defendants' tavern. The jury returned verdicts of guilty against the tavern

operators as well as against the defendant property owner, and the court entered judgments against the defendants in amounts totaling $15,000. On review the judgments were affirmed. With reference to defendants' contention that there was no competent evidence to establish the intoxication of Burroughs, the court said (p 346): "Whether a person is drunk or sober are facts patent to the observation of all, and their comprehension requires no peculiar scientific knowledge: Dimick v. Downs (1876) 82 Ill 570." Lindsey testified that when he went back to the Patrick Henry the second time, about one in the morning, he was "tight"; at that point Kimbrell had drunk about the same amount as Lindsey. After having gone out for a sandwich, Lindsey, about three twenty-five, for the third time came back to the Patrick Henry; Kimbrell and his companions had already returned from a tavern on Clark Street and were standing along the wall drinking beer. By one that morning Lindsey considered himself "tight"; it seems a safe assumption that by three twenty-five Kimbrell, who had not previously drunk anything for six months, would show some evidence of intoxication. Without question, the bartender should have refused to serve Lindsey after one o'clock, and if, as seem very probable, Kimbrell was intoxicated while he was in the tavern, the bartender should have refused to serve Kimbrell.

■ Nechi, present with counsel at the hearing before the commissioner, made no offer to explain the events which preceded the shooting. His reticence seems strange, since it was he who was seeking to retain his license. What, exactly, happened just before the fatal shooting? Why did Nechi want to turn Kimbrell over to the police—because he had seen Kimbrell kick some one or because while he, Nechi, was breaking up a fight in the tavern, he had seen Kimbrell standing behind him with an open two-inch blade knife? After the fight was broken up, after Kimbrell

333

had peacefully left the tavern, Nechi had everything under control. Why did he order Kimbrell to leave the tavern and then, at gun point, force him to return? What was his motivation for ordering Kimbrell back to the tavern and forcing him into an inner office where he was out of sight of everyone? These unanswered questions, together with Nechi's disregard of the statutory prohibition against serving liquor to intoxicated persons, were matters for the commissioner and the commission to consider, and they cannot be held to have acted in an arbitrary or a capricious manner in finding that Nechi was an improper person to operate a tavern.

██ Nechi's case rests basically on the argument that he killed Kimbrell in self-defense, and that he was not convicted of murder. A license is purely a personal privilege and does not constitute property; the renewal privilege cannot be construed as a vested right. (Ill Rev Stats 1961, c 43, § 119.) Conviction of a crime is not necessary to sustain a revocation of a liquor license. Hornstein v. Illinois Liquor Control Commission, 412 Ill 365, 369–370, 106 NE2d 354 (1952); Paoli v. Mason, 325 Ill App 197, 204, 207–208, 59 NE 2d 499 (1945). The Dram Shop Act is, in the words of the statute, to "be liberally construed to, the end that the health, safety and welfare of the People of the State of Illinois shall be protected and temperance in the consumption of alcoholic liquors shall be fostered and promoted by sound and careful control and regulation of the . . . sale . . . of alcoholic liquors." (Ill Rev Stats 1961, c 43, § 94.)

Recently, in Taylor v. Civil Service Commission, 33 Ill App2d 48, 178 NE2d 200 (1961), we reviewed an administrative review record in a case in which the trial court had set aside an order of the civil service commission discharging a patrolman in the police department for conduct unbecoming a police officer. The commission order was based upon the testimony of a

woman that she had been criminally assaulted by the officer. Taylor maintained that the findings and decision of the commission were against the manifest weight of the evidence because, inter alia, the grand jury had twice returned a no true bill in his favor. We held that the outcome of the criminal proceedings was immaterial, saying (pp 49–50) that "although the question of a crime was involved, the rule of reasonable doubt in criminal procedure does not control," relying on Sundquist v. Hardware Mut. Fire Ins. Co., 371 Ill 360, 21 NE2d 297 (1939).

In Kearns v. Aragon, 65 NM 119, 333 P2d 607 (1958), the Supreme Court of New Mexico, relying on cases from various jurisdictions, makes substantially the same points as does our court in the Taylor decision. The New Mexico court said (pp 609–610):

> "A proceeding before the Chief [of Liquor Control] to revoke a liquor license is not a criminal proceeding; rather it is an administrative proceeding in the nature of a civil action. Bradley v. Texas Liquor Control Board, Tex Civ App, 108 SW2d 300; Commonwealth v. Lyons, 142 Pa Super 54, 15 A2d 851; Kravis v. Hock, 137 NJL 252, 59 A2d 657. . . .
>
> " . . . .
>
> "Nor is the object of an administrative proceeding to revoke a liquor license intended as a punishment of the licensee. The purpose is to insure so far as possible the decent and orderly conduct of a business affecting the public health, morals, safety and welfare. Flowers v. Benton County Beer Board, Tenn, 302 SW2d 335; Cornell v. Reilly, 127 Cal App2d 178, 273 P2d 572. . . ."

 Under the Administrative Review Act the findings and conclusions of the administrative agency on questions of fact are to be held prima facie true and correct (Ill Rev Stats 1961, c 110, § 274). The law in

Illinois is well settled that the scope of judicial review is limited to a consideration of the record to determine if the findings and orders of the administrative agency are against the manifest weight of the evidence, and it has been consistently held that the courts are not authorized to reweigh the evidence or to make an independent determination of the facts. Parker v. Dept. of Registration & Education, 5 Ill2d 288, 293–294, 125 NE2d 494 (1955); Logan v. Civil Service Commission, 3 Ill2d 81, 86–88, 119 NE2d 754 (1954); and Taylor v. Civil Service Commission, 33 Ill App2d 48, 52, 178 NE2d 200 (1961).

In the case at bar Nechi did not have to testify, but since it was highly important to him to be licensed, it was to his interest to come forward, without being specifically called, with a satisfactory explanation of the circumstances which caused him to direct Kimbrell to come back into the tavern after he had been ordered out and had left without objection, as well as of the reason for shooting and killing him. The commissioner and the appeal commission were fully justified in refusing to believe his explanation as related to the police officers. It is inherently improbable, and cannot be reconciled with his forcible recall of Kimbrell to the tavern.

The Illinois Dram Shop Act expressly gives the local commissioner the power to grant, or revoke for cause, liquor licenses. (Ill Rev Stats 1961, c 43, § 112.) The rationale underlying this discretionary power is well stated in Daley v. License Appeal Commission, 11 Ill App2d 421, 425–426, 138 NE2d 73 (1956):

> "Aside from the language of the statute itself, there is a sound basis in public policy for vesting this discretion in the mayor as Local Liquor Control Commissioner. The retail sale of intoxicating liquors when not properly conducted is a business fraught with danger to the community. The

entire Dram Shop Act, with its ofttimes described 'harsh' provisions, indicates the legislature's awareness of this fact. The question of whether a particular applicant should be granted a local liquor license raises a peculiarly local problem having to do with the public health, safety and morals of the community. Who is better able to solve these problems than the elected mayor? He is best equipped to make these decisions because there are available to him various sources of information, from which he can intelligently decide to grant or reject an application for license.

"If the local commissioner does not have this discretion, his decisions in these matters are of no more effect than a recommendation to the License Appeal Commission. This is clearly not contemplated by the language of the statute. Paragraph 153 of the Dram Shop Act, which deals with appeals from the orders of the local commissioner, expressly states that the hearing before the State or the License Appeal Commission shall concern the *'matter of the propriety'* of the order or action of the local commissioner. In re Whitford's Liquor License (1950), 166 Pa Super 48, 70 A2d 708, involved the construction of the word 'propriety' as it appeared in a statute. The court said:

" 'A judicial inquiry as to the *propriety* of an act of a public authority involves judgment upon the discretion and wisdom exercised in the circumstances.' (Italics ours.)

"This language clearly indicates that the issue on appeal is whether or not the local commissioner abused his discretionary power, and whether he acted arbitrarily and without good cause."

█ The reasoning of the court in the Daley case applies with equal force to the situation now before

us. Nechi's conduct was patently of a nature to constitute a serious danger to the public safety. With respect to the commissioner's order, the trial judge was limited in his deliberations to decide only whether the commissioner, in revoking Nechi's license, had acted arbitrarily or abused his discretion, and whether the order was contrary to the manifest weight of the evidence; with respect to the commission's decision, the trial judge was limited in his deliberations to decide only whether the commission properly sustained the order of the commissioner. It seems clear to us that the commissioner did not act arbitrarily or abuse his discretion in revoking Nechi's license, or that the orders from which plaintiff appeals were contrary to the manifest weight of the evidence.

We hold that the trial judge was in error in finding the issues for plaintiff and accordingly in error in entering judgment reversing and vacating the revocation orders of the commissioner and of the commission. Therefore the judgment of the Circuit Court is reversed and the cause remanded with directions to reinstate the revocation order.

Judgment reversed and cause remanded with directions.

BRYANT, P. J. and BURKE, J., concur.