Max Weinstein and Jack D. Goldberg d/b/a Delaware Drug Co., Plaintiffs-Appellees, v. Honorable Richard J. Daley, Local Liquor Control Commissioner, Honorable John J. Cashin, Hearing Officer Local Liquor Control Commissioner, Defendants-Appellants, Honorable A. L. Cronin, Howard S. Cartwright and William McGuffage, Commissioners: License Appeal Commission of the City of Chicago, Illinois, Defendants.

Gen. No. 51,190.

First District, Second Division.

July 28, 1967.

Rehearing denied September 12, 1967.

Raymond F. Simon, Corporation Counsel, of Chicago (Sydney R. Drebin and Howard C. Goldman, Assistant Corporation Counsel, of counsel), for appellants.

Ross, Hardies, O'Keefe, Babcock, McDugald & Parsons, of Chicago (George J. O'Grady, of counsel), for appellees.

MR. PRESIDING JUSTICE LYONS delivered the opinion of the court.

This is an appeal by the defendants-appellants, the Honorable Richard J. Daley, Mayor of Chicago as Local Liquor Control Commissioner, and the Honorable John J. Cashin, Hearing Officer for the Local Liquor Control Commissioner. The appeal is taken from the entry of a judgment on November 15, 1965, by the Circuit Court of Cook County, which judgment reversed, vacated, and set aside said Local Commissioner's order of revocation of the retail liquor license of the instant plaintiffs, Max Weinstein and Jack Goldberg, d/b/a Delaware Drug Company, en-

tered some nine months prior thereto. The judgment ordered that the license (No. 5870) issued to the plaintiffs be reinstated accordingly. The order of the Commissioner had been theretofore appealed by plaintiffs to the License Appeal Commission pursuant to the provisions of the Administrative Review Act (Ill Rev Stats 1963, c 110, pars 264–279) which tribunal sustained the order of revocation on July 21, 1965.

The license revocation which gave rise to this cause was based upon the alleged unlawful sale of certain barbiturates, amphetamines, and hypodermic needles from the licensed premises contrary to the statutes of the State of Illinois and the ordinances of the City of Chicago. The sale was alleged to have been made by one of the principals to this action, plaintiff Weinstein, by and through his agent Albert Gumer, both of whom were licensed pharmacists. The drug company was operated by the colicensees as a joint pharmacy and liquor store enterprise with miscellaneous sundries similarly available for purchase therein.

At approximately 9:15 p. m. on July 9, 1964, Police Officer John Rosanne, Detective Donald Dura, and a Sergeant Gill, all being attached to the Narcotics Unit, travelled to the instant premises then under surveillance in an attempt to conduct a controlled unlawful sale of certain dangerous drugs. The three men had with them a "special employee" or "informer" through whom they had hoped to make the purchase. This informer was later identified at the hearing as William Gato. The customary initial precautions were taken, Gato being first completely searched and then supplied with a quantity of preinventoried currency of varying denominations with which to make the eventual purchase.

Gato entered the questioned establishment empty handed and emerged some 10 to 12 minutes subsequent carry-

473

ing a brown paper bag. None of the policemen witnessed the actual sale although they had all been stationed in proximity to the premises. Rosanne examined the contents of the bag finding two bottles labeled "Amphetamine," twenty-one red capsules containing a white powder, and three hypodermic needles. Gato gave the officer a description of the man with whom the sale had been consummated, which description corresponded to Albert Gumer.

The officers thereafter entered the store and arrested Weinstein and Gumer for unlawful sale of dangerous drugs. A search of the premises discovered the prerecorded currency in a can under the counter. Rosanne testified that Sergeant Gill examined the day's prescription blanks and could find no prescription bearing the name of the informer. Gato, himself, was then under arrest for his prior possession of dangerous drugs.

Charles Vondrak, a graduate registered pharmacist and 17 year employee of the Chicago Police Crime Laboratory, testified that his random testing of the red capsules discovered the presence of a barbitural derivative. He stated that he had similarly tested two tablets from the bottles and concluded they contained amphetamine hydrochloride, considered a dangerous drug. Plaintiffs attempted to cross-examine Vondrak relative to the laboratory procedures employed by him, but it was prohibited by the Hearing Officer.

Gumer, called on behalf of the colicensees, admitted to knowing the purchaser as William Gato. The witness explained that Gato had handed him a piece of paper bearing a prescription number which number corresponded to a prescription already on file in the pharmacy. He stated that that prescription bore the letters "PRN," a Latin abbreviation for "refill as needed." Gumer was unable to produce the alleged piece of paper, offering the explana-

tion that he had thrown it away. As a consequence, the Hearing Officer ruled that Weinstein could not introduce his prescription records into evidence nor could Gumer testify as to those portions of the transaction to which they purportedly related.

Gumer continued by describing the prescription on file as calling for ampules to be injected intravenously. The witness claimed to have thereafter substituted the same drug in tablet form, but only after he had made an unsuccessful attempt to reach the prescribing doctor by telephone. Gumer contended that the reddish colored capsules he had sold to Gato were Nytime, a nonprescriptive sleep inducing product. Gumer admitted to having sold to Gato, three hypodermic needles without a prescription upon the purchaser's representation that he might have some ampules remaining from a previous prescription for which the needles would be needed. The witness claimed that an oral prescription for those needles had been tendered by a Doctor Esposito in behalf of Gato several years prior when the latter had first become a customer.

On cross-examination, Gumer acknowledged that he had recognized all of the merchandise which the arresting officers displayed to him as the same drugs he had sold to Gato some thirty minutes earlier. Neither Sergeant Gill, Detective Dura, nor William Gato testified before the Hearing Officer. This was the extent of the testimony adduced at the Commission hearing.

It is the defendants' theory of the case (1) that the Commissioner acted within his statutory powers; (2) that the evidence overwhelmingly supported his conclusion that an unlawful sale had, in fact, been made; and (3) that the Circuit Court erred in reweighing the evidence and in considering matters not of record.

It is the plaintiffs' theory of the case (1) that the Commissioner acted outside the scope of the powers avail-

able to him; (2) that the evidence offered fails to sustain his finding that an unlawful sale had been made, hence the lower court properly reversed the order of revocation; and (3) that the Hearing Officer erred in barring the introduction of the prescription records and those portions of Gumer's testimony which related thereto.

██ Under the Administrative Review Act, a Circuit Court's consideration of an appeal of a license revocation brought before it from the License Appeal Commission is limited to matters of record. The court, in that capacity, can consider but two questions; to wit, (1) whether the local commission had acted arbitrarily or in clear abuse of its discretion, and (2) whether the order entered by that commission was contrary to the manifest weight of the evidence. Nechi v. Daley, 40 Ill App2d 326, 188 NE2d 243 (1963). Moreover, in this conjunction, the licensee's conviction of the crime to which his alleged misconduct related is neither necessary to sustain the order of revocation nor material. Nechi v. Daley, supra; Hornstein v. Liquor Control Commission, 412 Ill 365, 106 NE2d 354 (1952); Paoli v. Mason, 325 Ill App 197, 59 NE2d 499 (1945).

█ Under that statute, the findings and conclusions of the administrative agency on questions of fact are deemed prima facie true and correct until the contrary is shown. (Ill Rev Stats 1963, c 110, par 274.) Furthermore, public officials are presumed to have properly performed the duties of their office. El Patio, Inc. v. Illinois Liquor Control Commission, 20 Ill App2d 259, 156 NE2d 9 (1959).

The language of the Uniform Drug, Device and Cosmetic Act (Ill Rev Stats 1963, c 111½, par 402–15) is very clear in placing both barbitural and amphetamine compounds, mixtures, or derivatives thereof in the category

476

of a "dangerous drug." That same statute further provides:

"A dangerous drug shall be dispensed or sold at retail only (1) upon a written prescription of a practitioner, or (2) upon an oral prescription of such practitioner which is promptly reduced to writing and filed by the pharmacist, or (3) by refilling any such written or oral prescription, if such refilling is authorized by the practitioner either in the original prescription or by an oral order which is reduced promptly to writing and filed by the pharmacist. . . .

"A drug dispensed or sold at retail on a prescription of a practitioner. . . (2) such drug bears a label containing the name and address of the dispenser, the serial number and date of such prescription, or of its filling, name of the person for whom prescribed, such directions for use as required by the practitioner, and the name of the practitioner, . . ." (Ill Rev Stats 1963, c 111½, par 417.)

The Hypodermic Syringes and Needles Act (Ill Rev Stats 1963, c 38, par 22–54) states, in part:

"A licensed physician may direct a patient under his immediate charge to have in possession any of the instruments specified . . . which may be dispensed by a registered pharmacist . . . only (1) upon a written prescription of such physician, or (2) upon an oral order of such physician, which order is reduced promptly to writing and filed by the pharmacist, or . . . (4) upon a signed statement of the patient, upon proper identification, . . . provided however, that the registered pharmacists . . . who deliver or sell any instruments . . . shall send a copy of such affidavit to the Division of Narcotic Control by the 15th of the month following the month

in which such instruments were delivered or sold.
. . ."

██ Without dwelling on the point, it is apparent from the Report of Proceedings before us that the drugs and needles involved were sold under circumstances constituting violations of both the foregoing statutes. Such a conclusion was implicit from the numerous admissions in the testimony of both Weinstein and Gumer as well as the positive testimony of Officer Rosanne. The sale was never denied, nor did Gumer deny that the items obtained by the police were the same as that which he had sold to Gato. The existence of a prescription was never established either written or oral. The drugs were shown to have not been labeled. Moreover, Gumer admitted to having substituted tablets for ampules without authorization. Similarly, no written proof of Dr. Esposito's alleged oral prescription for the hypodermic needles was ever shown.

██ The entire hearing before the Commission hinged upon the credibility of Gumer's explanation of his conduct. The witness produced neither the alleged piece of paper nor the purported prescribing doctor to corroborate his version of the events, which account was in contradiction with that of Officer Rosanne. It was not within the province of the lower court to usurp the function of the Hearing Officer who saw and heard the witnesses by reweighing the evidence and reevaluating the credibility of the respective testimony. It is equally apparent that the trial judge was persuaded by matters dehors the record when taking into consideration the fact that plaintiff-Weinstein had been acquitted of the corresponding criminal charges brought against him. That case required a far greater quantum of proof to sustain a conviction.

██ We do not think that error was committed by the Hearing Officer in barring the introduction into evidence

of plaintiffs' prescription records. Rosanne attested to Sergeant Gill's inability to find a prescription bearing Gato's name. Plaintiffs neither produced the alleged piece of paper nor Dr. Esposito to bear out their contentions. Moreover, Gumer's admitted substitution of drugs without authorization and sale of unlabeled capsules or tablets, could have been held to be a violation of the statutes notwithstanding the existence of the purported prescription. Gumer was, contrary to plaintiffs' contention, afforded considerable latitude in describing the transaction and the alleged prescription on file.

Next, plaintiffs seize upon the absence of identification of the police informer as grounds for error. In this conjunction, plaintiffs cite numerous criminal cases which, of course, have no application to the proceeding at bar. The contention must fall for the simple reason that Gumer admitted that he knew the informer as William Gato. The sale had been conducted with all the requisite safeguards taken. The alleged prejudice to plaintiffs by being denied the opportunity to cross-examine the informer is again negatived by the admissions implicit in the testimony tendered in their behalf. The principles enunciated in Roviaro v. United States, 353 US 53 (1957), and upon which plaintiffs rely, involve a balancing of the equities in each specific case. Those principles are not so all encompassing so as to apply to the instant factual situation. People v. Hill, 83 Ill App2d 455, 228 NE2d 504.

█ The sole question that thus remains involves a consideration of the propriety of the action taken by the Commissioner under the guise of the Liquor Control Act. The pertinent sections of that statute provide, in part, as follows:

> "Powers of local commissioners. Each local liquor control commissioner shall also have the following powers, . . .

"1. To grant and or suspend for not more than thirty days or revoke for cause all local licenses issued to persons for premises within his jurisdiction; . . ." (Ill Rev Stats 1963, c 43, par 112.)

"Revocation or suspension of local license . . . . The local liquor control commissioner may revoke . . . any license issued by him if he determines that the licensee has violated any of the provisions of this Act or of any valid ordinance or resolution enacted by the particular city council, . . . or any applicable rule or regulations established by the local liquor control commissioner or the State commission which is not inconsistent with law. . . ." (Ill Rev Stats 1963, c 43, par 149.)

Plaintiffs, with reference to numerous authority, steadfastly maintain that the powers of the Local Commissioner are strictly limited to those found within the ambit of the Liquor Control Act. Pointing to article VII, section 5 thereof (Ill Rev Stats 1963, c 43, par 149), they vehemently contend that in the absence of a showing that the sale has violated the Liquor Control Act, a Chicago municipal ordinance, or any applicable rule of the Local Commission, the Local Commissioner is powerless and without authority to enter an order of license revocation. Plaintiffs submit accordingly, that no such violation has or can be shown, hence the Commissioner exceeded the powers delegated to him by the Act.

This court must take exception to plaintiffs' theory. The contention suffers from its inability to reconcile the wide grant of power available to the Commissioner to revoke "for cause" under the language of Ill Rev Stats 1963, c 43, par 112. Moreover, an analysis of the case law on the subject, indicates that so long as his actions are not arbitrary, the Commissioner is vested with broad discretionary powers in this regard.

480

Article IV, section 1 of the Act (Ill Rev Stats 1963, c 43, par 110) empowers the respective municipalities by ordinance:

". . . to establish such further regulations and restrictions upon the issuance of and operations under local licenses not inconsistent with law as the public good and convenience may require; . . ."

This proviso, in turn, is treated in the Municipal Code, City of Chicago (1964) under chapter 101, General Licensing Provisions, section 27, which states:

"If at any time after the granting of any license, any licensee shall have violated any of the provisions of this code or any of the statutes of the state in the conduct of his business, the mayor may revoke the license therefor."

Clearly, there has been a violation of the statutes of the State. We must, hence, answer plaintiffs' charge that the Commissioner has seized upon powers unlawfully delegated to him by ordinance in excess of powers available to him under the Liquor Control Act.

██ A license is purely a personal privilege to do what would otherwise be unlawful and hence carries with it no vested property right. Boerner v. Thompson, 278 Ill 153, 115 NE 866 (1917) ; Nechi v. Daley, supra. The provisions of the Dram Shop Act are to be liberally construed to the end that the health, safety, and welfare of the people of the state shall be protected. (Ill Rev Stats 1963, c 43, par 94.) The privilege of license, accordingly, must subordinate itself to the reasonable exercise of the discretionary powers of the local governing body.

██ The case law has now well established this principle. Notwithstanding the provisions of the statute upon which plaintiffs rely, there exists a fundamental public policy consideration for vesting the broad power to revoke "for cause" in the Local Commissioner. The wide-

spread retail sale of alcoholic beverages is a business which is said to be fraught with danger, an enterprise which if allowed to proceed unchecked, would place in imminent peril the public health, safety, and very moral fiber of the community. The rather dramatic provisions of the Dram Shop Act, itself, manifest such legislative concern. The question of revocation of a retail liquor license presents a peculiarly local problem which can be best solved by the respective Local Commissioners who, because of their proximity to and familiarity with the situation, have greater access to information from which an intelligent determination can be made. That determination should not be disturbed in absence of a clear abuse of discretion. Daley v. License Appeal Commission, 11 Ill App2d 421, 138 NE2d 73 (1956); Day v. Illinois Liquor Commission, 39 Ill App2d 281, 188 NE2d 883 (1963); Daley v. Kilbourn Club, Inc., 64 Ill App2d 235, 211 NE2d 778 (1965).

Plaintiffs next submit that the revocation is arbitrary, devoid of any reasonable relationship between the retail sale of liquors and pharmaceuticals. Taking cognizance of the increasing number of retail establishments which have yielded to competitive pressures and expanded into a multibusiness span of operations, we are of the firm opinion that a reasonable relationship does exist. Inferentially at least, bases for "cause" have been found in circumstances involving: attempted bribery of a police officer, Day v. Illinois Liquor Commission, supra; a bartender's discharging of a firearm, Daley v. Kilbourn Club, Inc., supra; gambling on the premises, El Patio, Inc. v. Illinois Liquor Control Commission, supra; and lewd conduct on the premises, Cermak Club, Inc. v. Illinois Liquor Control Commission, 30 Ill2d 90, 195 NE2d 178 (1963). While none of these cases bear directly on point, they do evidence, nonetheless, judicial recognition of the public's increased susceptibility to vice and corruption in the presence of alcoholic beverages.

482

Plaintiffs have failed to show that the findings of fact by the Hearing Officer and License Appeal Commission were contrary to the manifest weight of the evidence. Nor have plaintiffs adequately demonstrated to this court wherein the action of the Commissioner was either arbitrary or in clear abuse of discretion. Considerable authority, moreover, leads one to a contrary conclusion. Accordingly, it cannot be said that the provision of the Municipal Code empowering the Mayor to revoke for violation of a State statute is contrary to law as being in excess of the authority delegated to the City Council. Both the liberally construed provisions of the Dram Shop Act and the strong public policy considerations involved can point to no other conclusion.

For the above reasons, the judgment is reversed.

Judgment reversed.

BURKE and BRYANT, JJ., concur.