DUGAN'S BISTRO, INC., *et al.*, Plaintiffs-Appellees, *v.* RICHARD J. DALEY, Mayor of the City of Chicago, *et al.*, Defendants-Appellants.

First District (4th Division)   No. 76-320

Opinion filed December 29, 1977.—Rehearing denied January 27, 1978.

William R. Quinlan, Corporation Counsel, of Chicago (Daniel Pascale and Jerome A. Siegan, Assistant Corporation Counsel, of counsel), for appellants.

Robbins, Coe, Rubinstein & Shafran, Ltd., of Chicago (Manuel J. Robbins, Robert A. Coe, and Michael D. Schlesinger, of counsel), for appellees.

Mr. JUSTICE ROMITI delivered the opinion of the court:

The plaintiff tavern's license was revoked by the Liquor Control Commission for certain improper acts. The trial court reversed, finding the evidence insufficient to support the charges. We affirm in part and reverse in part and remand to the local commissioner for reconsideration of the penalty.

While several charges were brought against the plaintiff, Dugan's Bistro (the Bistro), the local commissioner, and later the License Appeal Commission, found the Bistro guilty of three. These were that:

1. On June 17, 1973, the licensee corporation, by and through its agent, Edward Davison, knowingly permitted a violation of the laws of the State of Illinois and/or Rules and Regulations of the Illinois Liquor Control Commission to be committed on the licensed premises, to-wit: lewd fondling by patrons, contrary to chapter 39, section 11—9(a)(4), Ill. Rev. Stat. 1973.

2. On January 25, 1974, the licensee corporation, by and through its agent, James Hough, doorman, knowingly committed a battery upon Gerald Britt, a patron on the licensed premises, contrary to chapter 39, section 12—3(a)(1), Ill. Rev. Stat. 1973.

3. On February 13, 1974, the licensee corporation, by and through its agent, Michael O'Callahan, doorman, knowingly and without lawful reason denied Linda Deleonardis entry into the licensed premises, contrary to chapter 43, section 133, Ill. Rev. Stat. 1973.

For these violations, the Bistro's license was revoked. The order was affirmed by the License Appeal Commission of the city of Chicago. As already noted, it was reversed by the trial court on the basis the findings were against the manifest weight of the evidence, apparently because they were based on too much hearsay. The Bistro does not, before this court, contend that the judge's conclusion that the findings were based on too much hearsay is correct. It does contend, however, that the trial court's decision should be affirmed because (1) the commissioner's conclusions as to all three charges were against the manifest weight of the evidence; (2) the local liquor control commissioner lost jurisdiction because he failed to render his decision within the five day period prescribed by chapter 43, paragraph 149 of the Illinois Revised Statutes; and (3) the appellant failed to provide this court with a complete record on appeal. The Bistro also contends that even if the violations be shown,

the determination of the commissioner that the license be revoked was arbitrary and unreasonable.

## I.

■■ The first of the three charges before the commissioner and now before the court is that the Bistro knowingly permitted certain lewd conduct to occur on its premises. The gist of this charge is knowledge. It is immaterial whether such conduct did occur unless it is shown that the Bistro had knowledge of the conduct at the time of the occurrence and by its inaction permitted it. (*Easy Life Club, Inc. v. License Appeal Com.* (1974), 18 Ill. App. 3d 879, 310 N.E.2d 705; *Evans v. License Appeal Com.* (1968), 95 Ill. App. 2d 121, 237 N.E.2d 817.) The licensee cannot be charged with conduct over which it has no control. *Childers v. Illinois Liquor Control Com.* (1966), 67 Ill. App. 2d 107, 213 N.E.2d 595; *Middleton v. License Appeal Com.* (1974), 20 Ill. App. 3d 534, 314 N.E.2d 596.

The city's only witness was police officer Thomas Fuller. Fuller testified that he and his partner entered the Bistro at about 1:30 a.m. on June 17, 1973. At that time the Bistro was filled to maximum capacity. The police officers went up to the bar, and ordered a drink. The room they were in, including the whole length of the bar, was about 85' by 40'. There were about 100 people in that room and it was crowded at the bar. While the police officers were standing at the bar, they saw two men sitting in a booth kissing each other and fondling each other in and around the groin. This conduct continued off and on for approximately 10 or 15 minutes.

Officer Fuller noticed several of the Bistro's employees in the room. When he first entered, he had seen one employee at the door checking identification. This is how Fuller determined he was an employee. He later saw him in an area around the bar. He also observed a man with a bar cloth on one occasion approach the table where the acts were taking place. This man, whom he assumed to be a waiter, spent approximately one-half minute at the table—about the time it takes to pick up five or six glasses—and wiped the table with a wet towel. Fuller also observed persons whom he believed to be employees, because they were carrying trays and bar towels, passing within five or six feet of the table on two other occasions.

After about 15 minutes, the two men in the booth and the manager of the Bistro, Edward Davison, were arrested. The charges were later dismissed at a hearing.

The two men testified for the Bistro, denying that they had engaged in any lewd conduct. Mr. Davison also testified for the Bistro. He said that at the time of the arrest the Bistro had been open for 17 days and had no waiters at that time. It did have one waitress, Barry Carol, who was very

obviously female and always wore dresses or skirts. If a customer wanted a table cleared it was customary for them to clear the table and pick up drinks. There were rags lying on the bar for customers to use. Doormen did not clear tables. He did not observe the two men in the Bistro before he was arrested.

The general policy of the Bistro was not to allow any necking or petting.

■■ Judicial review of a decision of an administrative agency must always begin with the realization that a court must consider the agency's findings and conclusions to be prima facie true and correct. (Ill. Rev. Stat. 1975, ch. 110, par. 274.) This mandate, however, does not relieve the court of its duty to examine the evidence in an impartial manner and to set aside an order unsupported in fact; when the findings of the commissioner are against the manifest weight of the evidence or where they are unsupported by substantial evidence in the record, the order must be set aside. *Middleton v. License Appeal Com.* (1974), 20 Ill. App. 3d 534, 314 N.E.2d 596.

■■ Assuming that Officer Fuller's testimony was sufficient to prove that lewd conduct occurred in the Bistro, in no way does it prove the Bistro had knowledge of the conduct. For us to conclude that the Bistro did have knowledge we must assume (1) that the persons passing the booth and the person who went up to the booth were employees rather than customers; (2) that the conduct, which occurred "off and on" during the 10 or 15 minute period, occurred at a time when the employees were present, and (3) that the employees observed the conduct in question and thereafter did nothing about it. But there is no evidence in the record which would permit us to make these assumptions. For us to conclude from the testimony that the Bistro did have knowledge of the conduct and thereafter by its inaction permitted the conduct to continue would require us to indulge in conjecture and surmise. This we cannot do. (*Middleton v. License Appeal Com.* (1974), 20 Ill. App. 3d 534, 314 N.E.2d 596.) Accordingly, since the local commissioner's finding as to this charge is unsupported by the evidence, it must be reversed.

## II.

The second charge was that the Bistro through its employee, James Hough, committed a battery on Lloyd Britt. Britt, a 33-year-old salesman, testified that he and three of his friends, Mike Miller, Jennie Anderson and another girl named Mary went to the Bistro about 11 p.m. on January 25, 1974. They had been together since about 7:30 p.m. They had gone to the London House for dinner, having an 8 p.m. reservation for its first show. He had a scotch on the rocks before dinner and wine before and with dinner, possibly also a cocktail with dinner and a Straga after dinner.

When they arrived at the Bistro, they got in line and waited for several minutes. After a few minutes, his date went on to the lavoratory without being checked. The others waited in line for about 10 minutes. They were asked for identification. One of the ladies (presumably Mike Miller's date) was asked for five pieces of identification. She did not have it. They asked why she needed it since she was obviously of age. The employees then asked the group to step away and continue their conversation on the side, and they were then asked to leave. Mike and his date went outside; Britt, however, remained standing on the side. When told to leave by Mr. Hough, he responded that he was waiting for his date, and would not leave until she appeared. Mr. Hough then struck him twice. He hit Britt on the cheek and dislocated his left shoulder. It happened quickly and at no time did Britt defend or protect himself. He did not recall striking anyone. Britt was not sure whether the first blow was struck on the way out of the door. Britt was then taken to the hospital by his friends.

Patrick Moran, a police officer, was not an eyewitness, but investigated after the occurrence was over. He testified as follows: He spoke to Britt's friends at the hospital and saw Britt. Mr. Miller and one of the young women were intoxicated. All of the three were under the influence of alcohol. Officer Moran concluded they were under the influence because they had an odor of alcohol on their persons and they said they had been at the London House and then at some other place before going to the Bistro in order to dance. Anyone would have concluded that Miller had been drinking since his clothes were a little bit messed and there was an odor of alcohol on his breath; however, he was steady in his moves. Officer Moran did not give any opinion as to whether Britt had been drinking. He saw him at the hospital in the emergency room but was only able to get his name. Britt was covered with sheets and there was an amount of blood on his lower face, mouth and nose area.

After talking to the four at the hospital, Officer Moran and his partner went to the Bistro. Hough told him he had struck Britt in self-defense; that the problem arose out of a conflict over identification cards. Someone else, not Hough, told Moran that Britt had threatened to "blow that nigger's head off if he did not let him in and stop bothering him for identification."

It appears from Officer Moran's testimony that while the police officers originally responded because of a telephone call from Wesley Hospital, a call was also made at the time of the incident by someone in the Bistro who identified himself on the telephone as the bartender.

All of the Bistro's witnesses had been employed by it at the time of the incident. Michael Anderson, the assistant manager, testified that he was checking the identification cards of persons waiting in line to enter when he first saw Britt. Britt was staggering and was either drunk or too high.

Anderson told Britt he could not serve him in that condition. Britt became argumentative and started calling Anderson names. Anderson felt he could not handle it so Jim Hough, another I.D. checker, came over. Anderson continued to check identification cards of others trying to enter; however, he did notice Britt grab Hough by the collar; then they went out of the door together. He did not see anything else of a physical nature. Mr. Anderson testified that during the time he was trying to handle Britt, Britt's companions were trying to calm him down.

James Hough, who no longer works for the Bistro (he left voluntarily), testified that he went over to Anderson when he heard Britt say "I am going to blow that nigger's head off." He then said to Britt that he believed Britt should not have made that remark and would Britt please remove himself from the premises. Britt then called him some abusive names. Hough then told Britt that he believed Britt was drunk. Britt grabbed him by the collar and Hough continued to say "Sir, would you please remove your hands and remove yourself from the premises, because I do not feel you have the ability to come into the business." Britt continued to use abusive language. Britt pulled Hough out of the door, then pushed him against a brick wall. Hough was hit in the jaw. Hough did not grab or shove Britt or shove him out of the door. After Hough was shoved against the brick wall he grabbed Britt but he did not swing at him. Davison and an off-duty policeman separated them. The policeman did not remain at the scene but he did make a report. However, the report was never introduced into evidence.

According to Hough, Britt's friends apologized to Hough for Britt's actions and said Britt was too high. He had taken some M.D.A.'s.[1] Miller was not however called to testify.

Robert Smith, who also had been acting as a doorman that night, testified he heard Britt say "I am going to get my gun and blow that nigger's head off." He saw Hough go over to Britt. He did not notice anything else.

Michael O'Callahan, another employee, testified that he saw the very end of the altercation outside. He saw Britt and Hough fall to the ground. Those nearby asked an off-duty policeman who was passing by to stop the fight. O'Callahan called the police and they came over and told everyone to stop it. They did. Miller put Britt into a taxi once the fight stopped and declined to wait for the police, saying Britt was too high on a drug called M.D.A. (this although O'Callahan had just testified that it was the police he had called who broke up the fight).

Davison testified that he first noticed Britt when he heard him say

---

[1] A controlled substance under the Controlled Substances Act (Ill. Rev. Stat. 1975, ch. 56½, par. 1204).

something about shooting a nigger. Davison followed the others outside the door. He told O'Callahan to call the police and O'Callahan told one of the bartenders to call them and then came back outside. Hough was against the wall and Britt was swinging at him. Then Britt and Hough tussled and fell to the ground; Davison stopped the off-duty policeman but he did not get his name. Britt's friends took him in a taxi and declined to wait for the police although Davison asked them to. Miller told Davison Britt was too high and apologized.

Florence Levine, an employee and wife of one of the owners of the Bistro, testified that she had noticed Britt because of the bit of confusion at the door. He was staggering and leaning against the door and the wall. His eyes were kind of blurring, blood shot, and he made quite a spectacle of himself, a lot of very loud talking and unruly behaviour. She heard some profanity and she heard the word "nigger" used. A young man with him tried to get him to leave and Britt said that "no punk son-of-a bitch is going to tell me whether I can come in or whether I have had enough to drink." She did not know what happened after that since there was a car waiting for her and she left.

■■ It is obvious that if we believe Britt's testimony the evidence was sufficient to support the local commissioner's finding that the Bistro, through Hough, was guilty of assault. In fact, if we believe Britt's testimony the assault was not only without justification but was without provocation. The appellee, in contending that the Bistro could evict Britt because he was intoxicated and had threatened the various employees, and that Britt assaulted Hough rather than vice versa and that only reasonable force was used in evicting Britt, is simply contending that the commissioner should have believed its witnesses and should not have believed Britt. To put it another way, the appellee is unhappy with the manner in which the issue of credibility was resolved. But it is for the local commissioner and not for the court to assess the credibility of the witnesses. (*Sarytchoff v. License Appeal Com.* (1973), 11 Ill. App. 3d 735, 297 N.E.2d 646; *Jackson v. Illinois Liquor Control Com.* (1973), 10 Ill. App. 3d 496, 295 N.E.2d 536; *Daley v. Jack's Tivoli Liquor Lounge, Inc.* (1969), 118 Ill. App. 2d 264, 254 N.E.2d 814; *Legones v. License Appeal Com.* (1968), 100 Ill. App. 2d 394, 241 N.E.2d 499; *Daley v. Richardson* (1968), 103 Ill. App. 2d 383, 243 N.E.2d 685; *Daley v. Perez* (1967), 81 Ill. App. 2d 478, 226 N.E.2d 676.) As this court stated in *Daley v. Jack's Tivoli Liquor Lounge, Inc.* (1969), 118 Ill. App. 2d 264, 277-78, 254 N.E.2d 814, 820:

> "In cases of this kind, we, and the Circuit Court, and the License Appeal Commission are all required to accept the judgment of the Local Commissioner as to the credibility of the witnesses. It is only he as the trier of the facts who is authorized to assess credibility

weigh the evidence, reconcile conflicting evidence, if possible, and, if not possible, determine which witnesses are worthy of belief. Crepps v. Industrial Commission, 402 Ill 606, 615, 616, 85 NE2d 5; Parker v. Department of Registration and Education, 5 Ill2d 288, 293, 294, 125 NE2d 494; Adamek v. Civil Service Commission of Chicago, 17 Ill App2d 11, 20, 149 NE2d 466; Daley v. Rifkin, 84 Ill App2d 467, 470, 228 NE2d 224; Ill Rev Stats 1967, c 43, §153 and c 110, §274. Neither the Circuit Court nor this court should disturb the Commissioner's decision so long as it is supported by substantial evidence, and is neither arbitrary nor contrary to the manifest weight of the evidence. Daley v. Kilbourn Club, Inc., 64 Ill App2d 235, 211 NE2d 778; Daley v. Johnson, 89 Ill App2d 100, 233 NE2d 95.* * *

* * *

In our opinion, the testimony of the police officer was adequate to establish violation of the soliciting statute and, therefore, adequate also to support the license revocation. We are unable to find in this record anything other than possible disbelief of this evidence (which, as we have pointed out, is not available to us) to justify the Circuit Court's determination that it amounted to entrapment or was otherwise insufficient."

Likewise as was stated in *Legones v. License Appeal Com.* (1968), 100 Ill. App. 2d 394, 403, 241 N.E.2d 499, 503:

"In sum, in the light of the whole record, we believe the testimony of the police officers presented sufficient substantial evidence to support the findings of the local commissioner. As plaintiff's employees denied the testimony of the police officers, it reduced the issue to one of credibility of the witnesses. The credibility of the witnesses here was a question for the local commissioner, who saw and heard them testify. It was the province of the commissioner to weigh the probabilities, judge the credibility of the witnesses, and determine whose testimony was more worthy of belief. There must be something more than the mere existence of conflicting testimony to warrant the conclusion that a finding of fact is erroneous. The decision of the commissioner cannot be said to be against the manifest weight of the evidence merely because the commissioner chose to believe the testimony of the police officers and not that of plaintiff's employees. (Crepps v. Industrial Commission, 402 Ill 606, 615, 85 NE2d 5 (1949).) In order for the decision of an administrative agency to be contrary to the manifest weight of the evidence, an opposite conclusion must be clearly evident."

## III.

The third charge was that the Bistro, in violation of section 12b of article VI of the Liquor Control Act (Ill. Rev. Stat. 1973, ch. 43, par. 133), knowingly and without lawful reason denied Linda Deleonardis entry into the premises. There is little serious dispute as to the facts involved as to this charge. Deleonardis, who was 25 years of age, went to the Bistro at about 11:30 p.m. on February 13, 1974, with two friends intending to have a nightcap. Upon attempting to enter they were asked for five pieces of identification. Deleonardis had only three, a driver's license, a student I.D. from Triton Junior College and a voter's registration card. She was told that that was not enough. Indeed, the doorman would not even look at the driver's license, simply insisting she must have five pieces of identification. Likewise when Davison, the manager, came over he did not look at her identification. According to Deleonardis, other people were walking right in at this time. She also testified that Davison said "we do not want any 'cunts' in here." Mr. Davison denied making this statement and both the doorman Smith and O'Callahan, another doorman, denied hearing Davison make any such statements.

There was a sign in the vestibule stating that patrons must carry five I.D.'s. There had also been stories in the *Chicago Maroon* and the *Chicago Reader* which indicated that five pieces of identification are required. The Bistro required nearly everyone to carry two pieces of identification with their age on it and at least one with a physical description on it. The other pieces are generally corroborative. It required five pieces because many people divided their identification documents allowing others to use some of them.

In fact, however, if the person has a passport no other identification is required because everything one needs is on it. Also, regular customers may be let in without checking; so, too, persons who are known and obviously of age. According to the testimony, most people coming to the Bistro are aware that identification is required. They usually hand the checker a wallet or a piece of identification to look at. He checks them and if he does not feel that it is enough he asks for more.

Mr. Davison testified that they do not exclude females or blacks. About 20 percent of the business is female. They do, of course, exclude minors.

We agree with the appellee that the commissioner erred in finding that the doorman, Michael O'Callahan, was the person responsible for preventing Linda Deleonardis from entering. O'Callahan's only act was to brush by her to go outside so he could check other persons who desired to enter. However, the Bistro failed to make this contention on its appeal to the License Appeal Commission. It is clear that the licensee was not misled on its appeal by this finding and that it has recognized throughout that the issues were whether Deleonardis was prevented from entering

and whether, if so, the Bistro was entitled to refuse to admit her. It is also clear from the testimony of the appellee's own witness that Linda Deleonardis was denied admittance. Therefore, the only question before us is whether the Bistro was entitled to deny her admittance.

We also agree with the appellee that the evidence is insufficient to show that Linda Deleonardis was excluded because she was a woman. It is undisputed that she was excluded; it is also undisputed that the Bistro had a well-publicized rule that only persons having five pieces of identification would be admitted (unless they had a passport) and Linda did not have the required identification. The only evidence tending to show that Linda was excluded because she was a woman was Davison's statement to her that they did not want any "cunts" in the place. She also testified that other people were allowed to enter without showing identification, but since there was no evidence that only men were allowed to enter without showing identification, this testimony fails to show that she was excluded because she was a woman rather than because the employees did not like her or because she lacked five pieces of identification. Furthermore, defendant's testimony that about twenty per cent of their patrons were women was not contradicted by any evidence presented to the commissioner.

■■■ The appellee both before the License Appeal Commission and before the court has contended that it has a right to exclude anyone it chooses unless this exclusion was on the grounds of race, creed, color, or sex, citing *People v. Root* (1912), 170 Ill. App. 608, which ruled that a person has no right to enter business premises where the owner has forbidden him to do so. We need not decide if the general rule set forth in *Root* and certain even earlier cases is still valid. Section 12b of article VI of the Liquor Control Act (Ill. Rev. Stat. 1975, ch. 43, par. 133), provides:

> "No licensee licensed under the provisions of this Act shall deny or permit his agents and employees to deny any person the full and equal enjoyment of the accommodations, advantages, facilities and privileges of any premises in which alcoholic liquors are authorized to be sold subject only to the conditions and limitations established by law and applicable alike to all citizens."

The language of the statute is clear. No licensee may deny admission to any person, subject only to the condition and limitation established by law applicable alike to all citizens. It is not sufficient that all persons are treated equally, in that all are required to produce five pieces of identification. The statute forbids the licensee to deny any person the full enjoyment of the accommodation, advantages, facilities and privileges. The statute does not limit its effect to denials based on race, creed, color or sex as for example did the statutes discussed by the courts in *Robinson v. Memphis & Charleston R.R. Co.* (1883), 109 U.S. 3, 27 L. Ed. 835, 3 S.

Ct. 18; *Woollcott v. Shubert* (1916), 217 N.Y. 212, 111 N.E. 829; *Garifine v. Monmouth Park Jockey Club* (1959), 29 N.J. 47, 148 A.2d 1.) Therefore we cannot read such a limitation into the statute. In effect, therefore, this statute which is much broader in scope than our civil rights statute (Ill. Rev. Stat. 1975, ch. 38, par. 13—2), grants the public full access to the premises of a business subject to the Liquor Control Act.[2]

■■ ■ A trier of fact could conclude that the Bistro unreasonably denied admittance to Deleonardis when it arbitrarily refused to allow her to enter since she lacked the magical number of "five" pieces of identification and did not even examine the identification she had to see if it was adequate. Sections 12 and 13a of article VI of the Liquor Control Act (Ill. Rev. Stat. 1975, ch. 43, pars. 131, 134a), permit and even require a licensee in doubt of the age of a would be purchaser to require that person to produce adequate written identification. However, adequate written identification is defined by section 12 of article VI as:

> "Adequate written evidence of age and identity of the person is a document issued by a federal, state, county, or municipal government, or subdivision or agency thereof, including, but not limited to, a motor vehicle operator's license, a registration certificate issued under the Federal Selective Service Act,[1] or an identification card issued to a member of the Armed Forces. Proof that the defendant-licensee, or his employee or agent, demanded, was shown and reasonably relied upon such written evidence in any transaction, forbidden by this Section is competent evidence and may be considered in any criminal prosecution therefor or to any proceedings for the suspension or revocation of any license based thereon."

We do not mean to imply that a licensee may under no circumstance demand to see more than a driver's license. The licensee might wish to see some corroborative identification tending to show that the first identification does in fact belong to the individual showing it. But is requiring four other pieces unreasonable? Few people would carry so much unless they are regular patrons. Furthermore, the Bistro did not merely require four pieces of identification tending to corroborate the first. It required, despite the statute's definition of adequate identification, one other piece of identification giving a physical identification and one

---

[2] The statute itself makes one exception, that is limitations established by law. In other words the licensee may of course exclude minors, persons who cannot produce sufficient identification to prove they are not minors, and intoxicated persons. The statute, however, obviously does not prevent it from excluding a few other classes of people. For example, it could exclude persons suspected of soliciting since it is forbidden to permit such conduct. Likewise, to protect its patrons, it can exclude persons, who threaten to create a disturbance. In addition it may charge admission, as long as anyone paying the admission is allowed to enter. *Walton Playboy Clubs, Inc. v. City of Chicago* (1962), 37 Ill. App. 2d 425, 185 N.E.2d 719.

giving age. This, in light of the nature of the identification most people carry, the commissioner could find to be totally unreasonable.

■■ Furthermore, the commissioner could conclude from the evidence that the Bistro, through its employees, was not engaged in a good faith effort to determine whether Linda Deleonardis was over 21, and did not apply its own regulations uniformly. While she was told five pieces of identification were required, in fact only one was required if the individual had a passport. Linda was not told this by any of the employees; she was not asked if she had a passport or told that that would be enough. Furthermore, the reason a passport was accepted as sufficient identification was that it had all the necessary information. But so would a driver's license if it had a photograph on it. Yet none of the employees ever looked at the driver's license to see if it could be considered adequate without any need for corroborative evidence. Nor was she asked if she had any identification with her photograph on it. In short, the commissioner could have concluded that the Bistro simply adopted an arbitrary requirement, not needed to protect itself from the unknowing admission of minors, which caused the exclusion of those who were, under the statute, entitled to enter.

However, it is not clear whether the local commissioner did in fact rule upon this issue. The local commissioner simply found that the Bistro had violated paragraph 143 without giving any reasons. From the arguments of both plaintiff and the defendant before the License Appeal Commission and before this court, it would appear that *both* parties believed that the issue was solely whether Linda Deleonardis was denied admittance because she was a woman. Under the circumstances, since this court is not the trier of fact, we believe the better course is to remand the issue to the local commission to determine in the first instance whether the identification requirements were arbitrary and unreasonable or, if they were reasonable, whether they were in fact applied inconsistently and in bad faith.

## IV.

■■ The appellee also contends that the local liquor commissioner lost jurisdiction to revoke the Bistro's license when he failed to render his decision within five days of the hearing. (Ill. Rev. Stat. 1975, ch. 43, par. 149.) However in *Alpern v. License Appeal Com.* (1976), 38 Ill. App. 3d 565, 348 N.E.2d 271, *appeal denied* (1976), 63 Ill. 2d 555, the court determined that the requirement of that statute was only directory not mandatory. That decision is controlling.

## V.

■■ The appellee next contends that the appeal should be dismissed

because no report of proceedings was filed, citing *Reace v. Reace* (1976), 39 Ill. App. 3d 496, 350 N.E.2d 143, *appeal denied* (1976), 63 Ill. 2d 563. The facts in the instant case are that on appeal to the trial court the plaintiff removed the report of proceedings which had been filed by the defendants as their answer, in order to abstract it as required by the trial court judge. Subsequently, the original report of proceedings could not be found despite an order entered by this court on April 30, 1976, ordering the clerk of the circuit court to file the report of proceedings as a supplemental record on appeal. The abstract filed by the plaintiffs is part of the record.

The rule of *Reace v. Reace* is not applicable here. Supreme Court Rule 323(c) provides that if the report of proceedings is not available, the parties may file a written statement of facts. The abstract filed by the appellee adequately serves this purpose since the appellants have also accepted it as an accurate report of the proceedings. Under the circumstances, the defendants were not required to go to the expense of having the court reporters retranscribe their notes. Furthermore, considering the fact that the report of proceedings was abstracted by the appellees not by the appellant, we do not see how they can claim to be prejudiced by its use. This court does not dismiss for a mere technicality totally unrelated to the administration of justice, particularly where, as here, the party whose appeal would be dismissed was not the one at fault, if in fact either was at fault, in the disappearance of the orginal report of proceedings.

## VI.

■■ The appellee last contends that the local liquor commissioner acted arbitrarily in revoking the Bistro's liquor license. The commissioner may revoke for cause all local licenses issued to persons for premises within his jurisdiction. Section 3 of article IV of the Liquor Control Act (Ill. Rev. Stat. 1975, ch. 43, par. 112) and section 27, chapter 101 of the Municipal Code of the city of Chicago permit the local commissioner (the mayor) to revoke the license for a violation of any statute of the State in the conduct of the licensee's business. Accordingly, the finding which we have upheld: that the Bistro, through its employee Hough, was guilty of an assault and battery would be sufficient cause to revoke. As stated in *Weinstein v. Daley* (1967), 85 Ill. App. 2d 470, 481-82, 229 N.E.2d 357, 364, *appeal denied* (1967), 37 Ill. 2d 626:

> "[T]here exists a fundamental public policy consideration for vesting the broad power to revoke 'for cause' in the Local Commissioner. The widespread retail sale of alcoholic beverages is a business which is said to be fraught with danger, an enterprise which if allowed to proceed unchecked, would place in imminent

peril the public health, safety, and very moral fiber of the community. The rather dramatic provisions of the Dram Shop Act, itself, manifest such legislative concern. The question of revocation of a retail liquor license presents a peculiarly local problem which can be best solved by the respective Local Commissioners who, because of their proximity to and familiarity with the situation, have greater access to information from which an intelligent determination can be made. That determination should not be disturbed in absence of a clear abuse of discretion."

Nevertheless, since it is not clear from the local commissioner's findings whether he would have revoked the Bistro's license had he found it guilty of fewer than all three charges, we deem it appropriate to return the case for reconsideration by the commissioner of the penalty to be imposed.

For the foregoing reasons, the judgment of the trial court is affirmed in part, reversed in part and the cause is remanded to the local commissioner for further consideration pursuant to this opinion.

Affirmed in part; reversed in part and remanded.

DIERINGER, P. J., and LINN, J., concur.