SOMERSET HOUSE, INC., Plaintiff-Appellee, *v.* BOARD OF APPEALS OF THE CITY OF CHICAGO *et al.*, Defendants—(BOARD OF APPEALS OF THE CITY OF CHICAGO *et al.*, Defendants-Appellants.)

(No. 54847; )

First District—December 30, 1970.

Richard L. Curry, Corporation Counsel, of Chicago, (Marvin E. Aspen and Marsile J. Hughes, Assistants Corporation Counsel, of counsel,) for appellants.

Deutsch, Peskin & Levy, of Chicago, (Bernard M. Peskin and Terry L. Engel, of counsel,) for appellee.

Mr. PRESIDING JUSTICE McCORMICK delivered the opinion of the court:

The plaintiff, owner of hotel premises at 5009 Sheridan Road, Chicago, filed an application with the Zoning Administration of the City of Chicago for a special use permit to operate the building as a sheltered care home. When that application was denied an appeal was taken to the Zoning Board of Appeals, which appeal was also denied on September 25, 1969. The plaintiff then brought an administrative review action in the Circuit Court. On December 25, 1969, the Circuit Court entered an order reversing the Zoning Board of Appeals and directing the Zoning Administrator to approve the application for special use. The defendants brought this appeal from that order of the Circuit Court.

■■ The property has been used as a hotel for 40 years, and the plaintiff now seeks to spend approximately $900,000 in remodeling the structure to comply with statutes and ordinances governing sheltered care homes. The building is not presently zoned in a proper classification to allow such use, and a special permit must be obtained before it could be so converted. The standards governing the issuance of such a permit are set out in section 11.10—4 of the Chicago Zoning Ordinance, chapter 194A, the Comprehensive Amendment thereto, adopted May 29, 1957:

No special use shall be granted by the Zoning Board of Appeals unless the special use:

(1) a. Is necessary for the public convenience at that location;

b. Is so designed, located and proposed to be operated that the public health, safety and welfare will be protected; and

(2) Will not cause substantial injury to the value of other property in the neighborhood in which it is to be located; * * *

It is the plaintiff's burden to prove that all standards established by the special use section will be met. *Allen v. Board of Appeals of the City of Chicago,* 118 Ill.App.2d 376, 381.

In its brief plaintiff first urges that sheltered care homes should be

permitted uses in B2 zoning districts, which is the classification of the subject property; that there is no valid reason for requiring a special use permit to convert the subject property. While this raises some interesting questions, we must agree with the view taken by defendants in their reply brief. The matter was not presented to nor ruled upon by either the Board of Appeals or the Circuit Court. "Assignments of error must be based upon the record itself and not merely upon arguments of counsel or upon the fact that the question might have been raised in the pleadings or during the trial." *Zehender & Factor, Inc. v. Murphy,* 386 Ill. 258, 261.

■■ Courts of review are obviously intended to review matters upon which rulings have already been made. Unless each adversary has had the opportunity of presenting his evidence and arguments to the lower tribunal, and unless a decision has been made on the point, it would be improper for an appellate court to consider it. In *Woman's Athletic Club v. Hulman,* 31 Ill.2d 449, at 454, the Supreme Court held that "the theory upon which a case is tried in the lower court cannot be changed on review and that an issue not presented to or considered by the trial court cannot be raised for the first time on review. (*Benson v. Isaacs,* 22 Ill.2d 606, 610.)" See also *City of Sullivan v. Central Ill. Co.,* 287 Ill. 19, 22, where the opinion states [in deciding whether or not jurisdiction was established in the Supreme Court on direct appeal from the Circuit Court], "it must appear from the record, and not merely from the statement of counsel and argument, that some question is involved which authorized the appeal."

We take the view that the relevant question in this case is not whether a sheltered care home should be a permitted use in a B2 zoning district, but rather whether the plaintiff adduced sufficient proof at the Zoning Board hearing to entitle it to the special use permit. Interestingly, one of the arguments in defendants' brief is captioned "THE PLAINTIFF HAS NOT PROVED THAT IT IS ENTITLED TO A SPECIAL USE TO OPERATE A SHELTERED CARE HOME AT THE PROPOSED SITE." However, the actual argument merely points to all the objections made at the hearing by various persons, including the alderman, the president of the Argyle Improvement Association, and the executive director of Chicago Uptown Commission. We feel this approach was taken in an attempt by defendants to overwhelm the court by pointing out all the objections to the proposed use, since they realized the plaintiff had proved its case.

At the hearing, Bernice Hover, Chief of the Bureau of Institutional Care for the City of Chicago, testified for the plaintiff, and explained the facilities offered by various types of homes. She stated that sheltered

care homes do not provide nursing care and are not intended for treatment of mental patients or alcoholics. She also testified that although there are 27 pending applications for sheltered care homes in Chicago, and despite the public demand for such facilities, there are none in the Uptown area. Mrs. Hover explained that sheltered care homes provide for people who cannot otherwise adequately care for themselves.

Donald H. Kemp, a real estate appraiser, testified that the area in which the Somerset Hotel is situated does not require apartment hotels; that he had a $1,300,000 commitment for a construction loan to rehabilitate the property and a commitment for one billion dollars from insurance companies to rehabilitate buildings in the area. He stated that the subject property is now worth $550,000; it is rapidly decreasing in value; as a sheltered care home it would be worth $2,000,000, and would be best utilized for that purpose.

Dr. Seymour Hershman, one of the principals interested in converting the subject property into a sheltered care home, testified that he hopes to develop a "de luxe" facility from which he could make a profit. He stated that the home would save money for both the State and the residents and its existence would release valuable medical personnel to the general community. It would accommodate 600 people.

In objecting to the issuance of the special use permit, Alderman Robert J. O'Rourke stated that there was already a proliferation of similar projects in his ward, resulting in dilapidated and inadequate facilities which failed to provide for those already living there. He also complained that there are traffic problems, not enough parking provided by the projected plans, and that plaintiff could not get the 31 proposed cars in the lot next door.

Homer H. Snodgrass, of the Argyle Improvement Association, said the merchants were "scared to death" of the proposed use. He added that residents of a halfway house in the area stood in front of his building examining garbage cans and soliciting his tenants. He also said that the 600 occupants of the home would not be potential buyers. There were several other objections on the ground that there were many similar institutions in the area and that it was becoming overrun with indigent persons. At the hearing it was found that 16 people were opposed to the suggested use.

■■ As previously mentioned, it was the plaintiff's burden to prove that the proposed use at the location in question was necessary for the public convenience; that is was so designed as to protect the public health, safety and welfare, and would not cause substantial injury to the value of other property in the area of its location. We believe that all of these elements were met and that the order of the Zoning Board of Appeals in

denying the permit was against the manifest weight of the evidence. Accordingly we find that the trial court properly reversed the Zoning Board.

■■ Since the Chief of the Bureau of Institutional Care testified that there were no such facilities in the Uptown area and that a need does exist for such, we feel that this constituted compelling evidence in favor of plaintiff's application, at least on that phase of its proof directed to "public convenience."

■■ There was also undisputed testimony that the facility would be rehabilitated in compliance with statutes and ordinances governing sheltered care homes. That testimony, in addition to Bernice Hover's explanation that the facility would not be used for mental patients or alcoholics, was relevant in establishing the protection of the public health, safety and welfare.

In opposition, our attention is called to portions of the general policies of the proposed home which indicate that residents will be permitted to leave the premises "to visit, shop, attend church, see a movie, attend a social function, or for any similar reason, as they wish unless good cause can be shown for refusing such permission." Another section provides that each resident "shall be allowed outdoors as often as possible * * *" with certain exceptions including one specifying "unless good cause can be shown for refusing such permission." It is also provided that those residents unable "to do so unattended shall be provided with constant attendance for their safety while outdoors."

■■ The defendants' claim that these regulations place no restrictions upon the freedom of movement of the proposed 600 residents, is unfounded. The regulations quoted provide that if good cause is shown permission may be refused for residents to leave the premises, and those unable to assist themselves will have "constant attendance." Thus, the policy appears to clearly take into account the public health, safety and welfare. Furthermore, from Mrs. Hover's explanation of the types who would not be accepted into such an institution, the fear would be unfounded that the residents might be troublesome people who would interefer with other residents of the area.

■■ Concerning the objection that the residents are not potential buyers and no help to local businessmen, we feel the less said, the better. If this is intended to show "substantial injury to the value of other property in the neighborhood * * *" the argument is not sound. The plaintiff's witness, Mr. Kemp, testified that the value of the land could be nearly quadrupled if the proposed use were put into operation. He pointed out that the general Uptown area is blighted, and since the hotel in question is in the center, it is hard to see how conversion of that property into

the proposed use could cause "substantial injury to the value of other property in the neighborhood * * *"

In *Hartung v. Village of Skokie,* 22 Ill.2d 485, the plaintiffs sought a special use to erect a motel and restaurant on their property. The Village Plan Commission recommended permission, but the Board of Trustees rejected the recommendation. The Circuit Court reversed the Board, and on direct appeal to the Supreme Court the Circuit Court's order was affirmed. In setting out the evidence the Supreme Court noted that a real estate broker and appraiser had estimated that the subject property was worth $60,000 under its zoning classification and would be worth $190,000 if granted the special use. In that case the zoning expert had admitted that the property was not suitable for the use for which it was zoned. In the case before us the real estate appraiser testified that the hotel now on the site was unnecessary for the area, and that the highest and best use for the property would be as a sheltered care home.

In *Hartung* there was general objection to the issuance of the special use permit on the ground that the proposed use would have a "negative or detrimental influence upon the Sharp Corner School, which is located * * * approximately 66 feet to the southwest of the subject property." [Page 492.] The plaintiffs did not directly oppose the truth of such assertions, but urged that the "adverse effects are minimal * * *" [*Ibid.*] At page 496 the *Hartung* court indicated that the "unrefuted hardship to the plaintiffs is evidenced by testimony indicating the value of the subject property for residential purposes to be $60,000, while its value for motel and restaurant purposes would be $190,000." In the present case the analogous figures are $550,000 as now zoned, and $2,000,000 if the special use is permitted. We believe the following statement from page 497 of the *Hartung* case is applicable:

"It appears to this court that any gain or inconvenience to the public from a continuation of present restrictions is small when compared with the hardship imposed upon the plaintiffs. Where such a situation prevails, the courts are fully justified in declaring the ordinance unreasonable, confiscatory and void. (*Krom v. City of Elmhurst,* 8 Ill.2d 104; *Tower Cabana Club, Inc. v. City of Chicago,* 5 Ill.2d 11.) This is especially true when the proof shows that the values of the surrounding properties will not be seriously, if at all, affected by the proposed use. *Myers v. City of Elmhurst,* 12 Ill.2d 537."

In the case before us the evidence as to "value" indicated that the hardship would primarily be the plaintiff's if the special use were denied. The only attempted showing to the contrary was by way of speculation on the part of local merchants that the occupants of the home would be indigent and would contribute little to the local cash registers.

Finally, the defendants argue that the plaintiff cannot meet the requirements for adequate parking as required by zoning law and that the permit should therefore be denied. The defendants calculate, from provisions of the zoning ordinance, that the least number of parking spaces allowed would be 87, and defendants urge that since the plaintiff has indicated that 31 spaces are to be provided, the application was properly rejected. Defendants admit that since the hotel was built prior to the effective date of the Zoning Amendment, the number of parking spaces now available at the hotel would suffice as a non-conforming use. They urge, however, that since the proposed use would be varied if the permit were issued, the property would then be required to comply with the off-street parking requirements of the Amendment.

Section 5.8—1(3) of the Zoning Amendment provides:

Whenever the existing use of a building or structure shall hereafter be changed to a new use, parking or loading facilities shall be provided as required for such new use. However, if the said building or structure was erected prior to the effective date of this comprehensive amendment, additional parking or loading facilities are mandatory only in the amount by which the requirements for the new use would exceed those for the existing use if the latter were subject to the parking and loading provisions of this comprehensive amendment.

In the instant case the use would be altered; thus, according to the first sentence of the section quoted above, parking facilities as required by the new use must be provided. There is a broad exception, however, in the second sentence. By its terms, if the building was erected prior to the effective date of the amendment [it is admitted that the Somerset Hotel was built prior to the amendment date], then additional parking facilities are mandatory only to the extent that the new use requirements exceed the existing ones. To make this computation we are to presume the existing use is subject to parking and loading provisions of the amendment. We must know how many spaces would be required if the existing use were subject to the amendment.

■■ Section 8.11—1(7) provides that one parking space shall be provided for each dwelling unit. There are 250 units in the hotel; if the existing use were subject to the amendment there would be a requirement of 250 spaces. By defendants' own computation, 87 spaces should now be required of plaintiff under the existing zoning law. Therefore, the requirement for the new use is far less than would be required under the existing use if it were subject to the zoning amendment. It follows that no additional parking is required, since section 5:8—1(3) would demand additional facilities only if the new use requirement exceeded the old.

We are of the opinion that the Zoning Board of Appeals should have granted the special use permit; that the decision to refuse the permit was against the manifest weight of the evidence, and the Circuit Court was correct in reversing the decision.

The judgment of the Circuit Court is affirmed.

Judgment affirmed.

LYONS and BURKE, JJ., concur.