MILE SQUARE SERVICE CORPORATION, Plaintiff-Appellant, *v.* CITY OF CHICAGO ZONING BOARD OF APPEALS *et al.*, Defendants-Appellees.

First District (2nd Division)    No. 62118

Opinion filed September 28, 1976.

Larry D. Blust, Michael J. Rovell, and Marsha E. Huff, all of Chicago (Jenner & Block, of counsel), for appellant.

William R. Quinlan, Corporation Counsel, of Chicago (Daniel Pascale and Lois S. Feinberg, Assistant Corporation Counsel, of counsel), for appellees.

Mr. PRESIDING JUSTICE STAMOS delivered the opinion of the court:

Plaintiff, Mile Square Service Corporation, commenced this action for administrative review of a decision of the Chicago Zoning Board of Appeals (hereinafter referred to as "Zoning Board") denying plaintiff's application for a variation in the nature of a special use. (Ill. Rev. Stat. 1973, ch. 24, par. 11—13—13.) By its application, plaintiff sought approval of the use of certain property owned by it, located at 3319-21 West Fulton in Chicago, as a halfway house for former drug abusers participating in a therapeutic rehabilitation program.[1] Joined with the Zoning Board and its individual members as party defendants to this action were all persons and organizations who appeared in opposition to plaintiff's application at a public hearing conducted by the Zoning Board. This appeal was perfected following the circuit court's affirmance of the Zoning Board's decision.

---

[1] Subsequent to the Zoning Board's decision and prior to the filing of its complaint for administrative review, plaintiff filed a declaratory judgment action in the Circuit Court of Cook County (*Mile Square Service Corp. v. City of Chicago*, No. 74 L 8422) seeking a declaration that it does not need a special use permit in order to operate its program on the subject premises. That action is still pending. Since the issue raised by that action was neither presented to nor ruled upon by the Zoning Board in the instant action, we need not consider it further. See *Somerset House, Inc. v. Board of Appeals* (1970), 131 Ill. App. 2d 569, 266 N.E.2d 508.

Plaintiff brings three issues to our attention: (1) whether the finding of fact made by the Zoning Board upon which its decision was predicated is contrary to the manifest weight of the evidence; (2) whether the Zoning Board erred by refusing to consider additional evidence submitted by plaintiff subsequent to the hearing on plaintiff's application; and (3) whether plaintiff was deprived of its right to a full review of the Zoning Board's decision owing to the conduct of the circuit court judge sitting in administrative review of that decision.

Mile Square Health Center, Inc. (hereinafter referred to as "Mile Square") is an Illinois not-for-profit corporation which operates a community-based and -controlled comprehensive health-care facility which provides medical, dental, and mental treatment. These services are subsidized in part by both State and Federal funding. Plaintiff is a wholly owned subsidiary of Mile Square; its function is to hold title to realty used by Mile Square in the latter's programs.

In 1971, the Federal government requested Mile Square to assume control of a drug rehabilitation program being conducted in Chicago. Mile Square's initial efforts with this program were unsuccessful. Since persons were treated on a walk-in basis, the staff retained no supervisory control over the patients after they had left the facility. Consequently, the momentary concern of many of the individuals who sought rehabilitative guidance would wane, once the pressures from their environment resumed. However, a complete turnaround of the program resulted when Mile Square established a residential therapeutic facility to house the participants in the rehabilitation program. The success of this innovation was directly attributable to the full-time supervision which each participant received and to their enhanced appreciation of the community due to the residential, as opposed to institutional, setting. As Federal funding increased with the success of the program, a desire to expand the program to involve more participants was manifested, thus necessitating a larger residential facility.

The site which is the subject of the instant action was selected for expansion purposes for two primary reasons. First, its residential location was only a short distance from the health center where the participants received and would continue to receive all medical treatment. Second, the building, which had formerly been utilized as a nursing home, was equipped with institutional kitchen and plumbing facilities, thereby decreasing the initial cost of expanding the program. Because this site is located in a general residence district which is zoned R4, plaintiff filed an application for a special use permit.

Although a special use permit may be granted so as to allow property located in a district zoned R4 to be utilized as a residential care home or halfway house (Chicago, Ill., Chicago Municipal Code (1974), ch. 194A,

§7.4—4(8)), plaintiff's application was not approved by the Zoning Administrator. Pursuant to the Chicago Zoning Ordinance (Chicago, Ill., Chicago Municipal Code (1974), ch. 194A, §11.10—1 *et seq.*), plaintiff perfected an appeal from the Zoning Administrator's decision to the Zoning Board. The applicable ordinance requires that two prerequisites be satisfied before the Zoning Board can authorize a variation in the nature of a special use. (Chicago, Ill., Chicago Municipal Code (1974), ch. 194A, §11.10—2.) First, upon due notice, a public hearing must be held before the Zoning Board. Second, a written report must be prepared and filed with the Board by the Commission of Development and Planning, such report to become a part of the record.

On May 13, 1974, the Department of Development and Planning submitted a written report to the Zoning Board recommending that plaintiff's application be denied. The Department objected to plaintiff's proposed use of its premises "as it may have a deleterious effect in the surrounding area."

On May 17, 1974, a public hearing was held before the Zoning Board. At that proceeding, several witnesses testified in support of plaintiff's application, and numerous other witnesses voiced their objections to the proposed use of the subject premises.

The parameters and goals of Mile Square's therapeutic program were explained. Applicants for the program are screened in an attempt to ascertain their sincerity in seeking rehabilitation. Those individuals who are admitted to the program are then detoxified under a methadone detoxification program. Thereafter, the participants reside at the residential center where they participate in various workshops and seminars structured to prepare them for a drug-free existence in society. Throughout the program, biweekly examinations are conducted to assure that the participants remain drug-free. As each person progresses through the program, they are allotted more opportunities to engage in activities outside of the residential center. At all times, records listing the activities of each resident are maintained to help prevent external pressures from encouraging a participant to abandon the program. A participant normally achieves outpatient status after residing at the residential center for five months. Then, during the next 12 months, the outpatient's adjustment to the community is evaluated so that any problems which might arise can be detected and, hopefully, resolved. An outpatient can then become a graduate of the program "when, after all phases have been therapeutically exhausted, the patient has demonstrated satisfactorily that in attitude, emotions and behaviour he can function in the community free of drugs." An estimated 24% of the persons admitted to the program attain graduate status.

In addition to this evidence, other witnesses called by plaintiff

enumerated the benefits derived from establishing therapeutic centers for former drug abusers in residential areas. Such locations are deemed preferable because they offer the residents exposure to a home and a community environment, whereas an institutional atmosphere tends to be counterproductive since it fosters alienation and dependence. Although it was acknowledged that community opposition to such programs is commonplace when halfway houses are first opened in residential neighborhoods, it was the belief of these witnesses, either from personal experience or from analyzing the success of similar programs, that community hostility and apprehension subside as residents of the neighborhood become more knowledgeable about the program and recognize that additional problems have not been created by the existence of the therapeutic facility near their homes. It has been the experience of other similarly structured programs that drug addicts stay away from residents of a therapeutic center, even when such facilities are located in neighborhoods afflicted with a high volume of drug traffic. An example of community reaction to such programs after they have been in operation for a period of time is a petition signed by 60 residents of the neighborhood where the Mile Square residential facility was *formerly* located stating that the residents at the center "are fine neighbors and their property is well kept."

The last two witnesses called by plaintiff were qualified as real estate experts. The first expert witness was both a real estate broker and an appraiser. Although he had not sold real estate in the area of the subject property in over seven years, he had visited the subject property on several occasions and was familiar with the surrounding neighborhood. It was his opinion that the proposed use of the subject property would not cause injury to the value of other property located in the neighborhood. This opinion was predicated on three factors. First, prior to plaintiff's possession of the premises, the building located thereon had been vacant for over 1½ years. Since vacant buildings are prone to dereliction and vandalism, it is a benefit to the neighborhood if the building is occupied. Second, it appeared that plaintiff would properly maintain the premises as evidenced by landscaping improvements which had already been made. Third, the proposed use of the premises would not bring additional people into the neighborhood and would cause less traffic in the area than was present when the building had been utilized as a nursing home.

Examination of this witness by a member of the Zoning Board revealed the following:

"Q. Do you think the fact that you had a house for sale next door to this building that is being used by [Mile Square], that you would have difficulty in selling it at market value?

A. With some buyers, yes. It would take a longer time to qualify a

buyer for it because of the attitude that is now existing in the community.

But I think over a period of time, it would negate.

Q. So you do feel that if someone from out of the community was to move into that community and you had a house for sale next door to the [center], that you might have difficulty selling it?

A. I believe today, if we were to offer the house for sale with the climate in the community as it is now, it would be.

Q. This person that would be coming in to buy it would not know generally the climate of the community with reference to [the Mile Square program].

But if you told him, 'I have a home here.' They say, 'Well, what is next door? Is this a nursing home?'

And you told him what it was. Do you think you would have difficulty selling it?

A. No more than I would if it was a better nursing home, no, I don't believe."

The witness elaborated that the market for real estate in this neighborhood at the time of the hearing was depressed because of the prevailing tax and interest rates. And although FHA financing was available to this community, conventional mortgage arrangements were difficult to obtain.

The second expert witness was familiar with the property values in the neighborhood. In his opinion, the proposed use of the subject property by Mile Square would not cause injury to the real estate property values in the neighborhood. As support for this opinion, the witness reasoned that "where a building is vacant, if you allow it to stay vacant for two years, that would be more of a detriment to the neighborhood than the fact that the building now is being used for its present purpose."

Examination of this witness by a member of the Zoning Board disclosed that the witness had never handled a real estate transaction involving property situated in the same block as the subject premises. The witness was also asked if his opinion (that the proposed use would not cause substantial injury to the value of neighboring property) was based upon reasons other than the fact that the subject premises would no longer be vacant. He then listed as additional reasons for his opinion that a considerable investment would be made to restore the property; that the present accommodations were adequate for the proposed use; and that the premises would probably remain vacant if plaintiff's application was denied since the property is not suitable for many other uses.

Ten witnesses testified in opposition to plaintiff's application, and numerous persons conveyed similar objections in writing to the Zoning Board. In general, many residents were proud of the residential nature of

their neighborhood and desired that the area remain solely residential. A concern for safety and beautification was prevalent in the neighborhood, as evidenced by the expenditure of over $6,000 for neighborhood improvements during an 18-month period preceding the hearing. Other area residents were fearful of the adverse influence a halfway house for former drug abusers would have on their children, notwithstanding the fact that many of the children had already been exposed to drug-related problems at their schools. Since plaintiff's property is located in the general vicinity of five schools, numerous school-age children would walk by the therapeutic center on a regular basis. One witness testified that she once observed several people dancing to loud music on the balcony of the center, and, on another occasion, she encountered at night a group of 10-15 people standing in an alley behind the center.

An alderman from a neighboring ward testified that a few businesses and residents moved from his ward after a walk-in drug rehabilitation facility was opened in their neighborhood. The alderman representing the ward wherein the subject property is located testified that, since drug pushers tend to congregate near walk-in drug treatment centers, he anticipated that a similar situation would develop around the Mile Square center, notwithstanding the fact that it is a residential facility. Two landlords who owned apartment buildings adjacent to and across the street from plaintiff's property testified that some of their tenants threatened to move if the Mile Square program continued nearby.

In rebuttal, plaintiff presented the sworn statement of a neighbor who expressed his approval of the program. He had not observed undesirable people either associated with or attracted to the center. Furthermore, other residents in the neighborhood had related to him their appreciation of the improvements which Mile Square had made to its property and their desire to similarly beautify their premises.

Upon the evidence presented at the public hearing and following an unanimous vote by the five members of the Zoning Board, plaintiff's application was denied. As required by statute (Ill. Rev. Stat. 1973, ch. 24, par. 11—13—11), the resolution of the Zoning Board contained findings of fact. The essential finding of fact, upon which the Board's decision was predicated, reads as follows:

> " * * * that adequate proof was not presented to the Board to indicate that the establishment of the halfway house in a block that is improved predominantly with two-apartment residential buildings would not cause substantial injury to the value of other property in the neighborhood, * * *."

Plaintiff's first contention is that the Zoning Board's finding of fact set out above is against the manifest weight of the evidence. In support of this contention, plaintiff refers to the uncontradicted testimony elicited

from its two expert witnesses that the proposed use of the subject property would not have a deleterious impact on the surrounding property in the neighborhood. Plaintiff also maintains that the establishment of a residential therapeutic facility, as opposed to a walk-in center, has the effect of driving drug traffic from the neighborhood. When evaluating the evidence adduced in opposition to plaintiff's application, plaintiff not only emphasizes the absence of rebutting expert testimony, but characterizes the objectors' testimony as being premised upon mere speculation and unfounded fears without the benefit of substantiating facts. Therefore, concludes plaintiff, the record supports a determination opposite of that reached by the Zoning Board.

■■ Plaintiff correctly sets forth the standard of review which must be applied by this court when sitting in judicial review of the findings and decision of an administrative agency. Findings and conclusions on questions of fact made by an administrative agency shall be held to be prima facie true and correct. (Ill. Rev. Stat. 1973, ch. 110, par. 274.) The reviewing court's function is limited to ascertaining whether the findings and decisions of the agency are against the manifest weight of the evidence, and the decisions of the agency should be disturbed only if a review of the record indicates that they are against the manifest weight of the evidence. *Roosevelt Memorial Hospital v. Chaddick* (1970), 131 Ill. App. 2d 82, 266 N.E.2d 755.

The Chicago Zoning Ordinance (Chicago, Ill., Chicago Municipal Code 1974, ch. 194A, §11.10—4) enumerates the following standards which must be satisfied before the Zoning Board is authorized to grant a special use permit:

"Standards. No special use shall be granted by the Zoning Board of Appeals unless the special use:

(1) a. Is necessary for the public convenience at that location;

b. Is so designed, located and proposed to be operated that the public health, safety and welfare will be protected; and

(2) Will not cause substantial injury to the value of other property in the neighborhood in which it is to be located; and

(3) It is within the provisions of "Special Uses" as set forth in rectangular boxes appearing in Articles 7, 8, 9, and 10; and

(4) Such special use shall conform to the applicable regulations of the district in which it is to be located."

The language of this ordinance is in the conjunctive. Therefore, an applicant for a special use permit has the burden of proving that the proposed use meets all of the standards required by the ordinance. (*Allen v. Board of Appeals* (1969), 118 Ill. App. 2d 376, 254 N.E.2d 840.) However, the failure of the applicant to adduce sufficient evidence to

fulfill one or more requirements of the special use ordinance will not necessarily justify the denial of the proposed use if such prohibition does not bear a real and substantial relation to the public health, safety, morals or general welfare (*Lazarus v. Village of Northbrook* (1964), 31 Ill. 2d 146, 199 N.E.2d 797) and if there is no adverse effect on adjacent properties. (*Kraegel v. Village of Wood Dale* (1973), 10 Ill. App. 3d 486, 294 N.E.2d 64.) Since a special use zoning ordinance does not allocate any particular zones for the establishment of these unique uses as a matter of right, the local zoning authority is vested with broad powers in determining the suitability of a given site for the proposed special use. *Pioneer Trust & Savings Bank v. County of McHenry* (1968), 41 Ill. 2d 77, 241 N.E.2d 454.

In the instant case, the Zoning Administrator denied plaintiff's application since the proposed use did not conform with the zoning ordinance. The Department of Development and Planning recommended that the application be denied because of the deleterious effect the proposed use might have on the surrounding neighborhood. Upon consideration of the evidence which was adduced at the public hearing, the Zoning Board was unanimous in its determination that plaintiff failed to present adequate evidence that the proposed use would not cause substantial injury to the value of other property in the neighborhood. This determination was sustained by the circuit court on administrative review. After carefully reviewing the record, we are of the opinion that neither this finding of fact, nor the decision predicated thereon, is contrary to the manifest weight of the evidence. The Zoning Board determined that plaintiff failed to sustain its burden of proof. Implicit therein is that some evidence favorable to plaintiff was adduced. Indeed, plaintiff emphatically directs our attention to that evidence and asserts that only a single conclusion can be drawn therefrom. But we are not persuaded to disturb the Zoning Board's decision since our examination of the record compels us to conclude that an opposite decision is not clearly evident. *Wolbach v. Zoning Board of Appeals* (1967), 82 Ill. App. 2d 288, 226 N.E.2d 679.

As we view the record, the evidence adduced by plaintiff, which tends to show that the continuation of its rehabilitation program on the subject premises would not have an injurious impact on the value of surrounding properties, pertained to three general points. First, ample evidence was introduced depicting the program conducted by Mile Square as being progressively structured and professionally administered. Second, residential therapeutic centers were distinguished from walk-in treatment facilities on the critical aspect that residential centers tend to deter, rather than to encourage, drug trafficking in the neighborhood

where the halfway house is located. Third, two expert witnesses expressed their opinions that the proposed special use of the subject property would not decrease the property values of neighboring real estate.

It is unquestioned that drug abuse is a major societal concern. That the Mile Square organization has forthrightly confronted this problem and has implemented innovative procedures resulting in improved drug rehabilitation techniques likewise is not subject to debate. One factor to which the relative success of the Mile Square program is attributed is that it establishes its facilities in residential districts. However, the fact that it is considered essential to locate these centers in residential areas does not suggest that such a location is necessarily in the best interests of a particular neighborhood. Perhaps this fact contributes to the underlying rationale of the Chicago Zoning Ordinance which designates the establishment of a halfway house in a district zoned residential as a proper subject for a special use application rather than as a permitted use in such districts as a matter of right. On each such application an *ad hoc* determination is required. *Kotrich v. County of Du Page* (1960), 19 Ill. 2d 181, 166 N.E.2d 601.

As set out above, plaintiff presented evidence on three general points. The evidence adduced on the first two points established the merit of the Mile Square program of drug rehabilitation. Evidence adduced on the third point pertained to the impact on the neighborhood of establishing such a program on the subject premises. It is true that plaintiff's expert witnesses opined that the program would not prove harmful to property values in the neighborhood. It is also apparent from the record that the Zoning Board was placing great weight on the rationale supporting these opinions. Both witnesses emphasized the fact that the building situated on the subject premises was a nursing home which had been vacant for about two years before Mile Square took over. They both reasoned that it would be more beneficial to the neighborhood to allow the proposed use rather than to leave the building vacant. One member of the Zoning Board acknowledged that it would be preferable for the building to be occupied, but, in an attempt to elicit testimony regarding the impact of the *nature* of the use of the premises, he noted that the impact on the neighborhood would vary depending on the nature of the use. For example, he suggested that the impact would be more favorable if the building was utilized as a financial institution rather than as a house of prostitution. However, notwithstanding this observation, little evidence was elicited regarding the impact of the nature of the proposed use aside from testimony that it would be difficult to sell property in the neighborhood due to depressed property values regardless of the manner

in which the subject premises is utilized. The Zoning Board may not have been persuaded by this evidence in light of other evidence that the residents of the neighborhood had raised and expended money on neighborhood improvements in an attempt to counteract the deterioration of their community.

■■ Furthermore, even though a specific finding of fact was not entered on this point, we believe that the Zoning Board's denial of plaintiff's application bore a substantial relation to the public health, safety, morals or general welfare of the neighborhood (see *Lazarus v. Village of Northbrook*). Several schools are located within close proximity to the subject premises. As one of plaintiff's witnesses revealed, school-age children are impressionable and could be adversely influenced by exposure to drug-related problems. For this additional reason, we do not consider the Zoning Board's decision (that the subject premises is not an appropriate site for the expansion of Mile Square's program) to be contrary to the manifest weight of the evidence.

Plaintiff's second contention pertains to four affidavits tendered by plaintiff to the Zoning Board *subsequent to* the public hearing. The affiants were residents of a neighborhood where another Mile Square residential therapeutic center had been located, and they expressed their opinions concerning the value of their property in light of Mile Square's activities in their neighborhood. The affidavits were submitted after the Zoning Board had reached a decision in the instant case, but prior to that decision's having been announced or otherwise having been brought to plaintiff's attention.

■■ We consider these affidavits to possess little, if any, probative value with respect to plaintiff's application for special use permit. As previously discussed, such applications must be considered by the Zoning Board on an *ad hoc* basis. Although the special use of premises for a particular purpose in one residential district might prove beneficial, the same special use in another residential district could render detrimental results. Thus, an "it's worked before" analysis is not necessarily relevant to the essential question before the Zoning Board of whether the proposed use on the subject premises will be compatible, in accordance with the standards enumerated in the ordinance, with the use being made of neighboring properties and other relevant factors. Consequently, we find no prejudice to plaintiff from the Zoning Board's refusal to reconsider its decision or from the circuit court's refusal to remand the cause on this ground for further proceedings.

■■ By its third contention, plaintiff argues that it was deprived of its right to full consideration of its complaint for administrative review due to the alleged improper conduct of the circuit court judge. An

examination of the record reveals that plaintiff's right to administrative review was not abridged, and we deem additional comment on this issue unnecessary.

For the foregoing reasons, the judgment of the circuit court sustaining the decision of the Chicago Zoning Board of Appeals is affirmed.

Judgment affirmed.

HAYES and JIGANTI, JJ., concur.