CHARLES SPECK *et al.*, Plaintiffs-Appellees, *v.* ZONING BOARD OF APPEALS OF THE CITY OF CHICAGO *et al.*, Defendants-Appellants.

First District (4th Division)    No. 79-817

Opinion filed December 23, 1980.—Rehearing denied March 12, 1981.

Daniel L. Houlihan, of Chicago (Dore & O'Toole, Ltd., of counsel), for appellant, *pro se*.

William R. Quinlan, Corporation Counsel, of Chicago (Robert R. Retke, Philip L. Bronstein, and Regan D. Ebert, Assistant Corporation Counsel, of counsel), for appellant Zoning Board of Appeals.

Lord, Bissell & Brook, of Chicago (Robert A. Knuti and Daniel I. Schlessinger, of counsel), for appellees.

Mr. JUSTICE ROMITI delivered the opinion of the court:

Amalgamated Trust and Savings Bank, as trustee, Edward Ochylski, Jr., and Daniel L. Houlihan (hereinafter called the applicants), filed an application for a variation in the nature of a special use for the approval of the location and erection of an addition to the south of an existing building to be used as a meat packing plant, including slaughtering, rendering, cutting and boning facilities in an area zoned manufacturing. The plaintiffs-appellees (hereinafter called the objectors) intervened as objectors in the proceeding. With one exception, they are residents living near the property. After a hearing, the zoning board of appeals granted the application. Upon appeal by the objectors, the circuit court found that while the determination that the proposed use was necessary for the public convenience was supported by the evidence, the other findings were not supported by the evidence and the board failed to set forth findings of fact with respect to the requirements of the ordinance. Accordingly the circuit court ordered that the zoning board's decision be reversed and the special use variation requested by the applicants be denied. The zoning board of appeals but not the applicants appealed. The objectors did not cross-appeal. We hold that:

(1) the zoning board of appeals had standing to appeal from a reversal of its decision;

(2) any error in the hearing examiner's decision that there was no continuing nonconforming use was clearly waived by the applicants at the hearing before the zoning board of appeals;

(3) the applicants failed to meet their burden of proving that the operation of the slaughterhouse would conform to the applicable regulations, and the zoning board of appeals failed to make the necessary findings, indeed could not make them since insufficient evidence had been produced on those issues. Since it is clear that the applicants and the board believed that such evidence was not necessary and the legislature has given the consideration of these questions to the agency, we believe that justice is better served by a reversal of the board's decision and a remand to it for additional hearings and consideration of the necessary issues.

I.

■■ When the appeal was filed in the circuit court, Daniel Houlihan filed his appearance for the applicants. William Quinlan filed his appearance as attorney for the zoning board of appeals and the enumerated members thereof. After the circuit court reversed the zoning board's judgment, Quinlan filed notice of appeal for "the defendants, Zoning Board of Appeals, et al." A copy of the notice was sent by Quinlan to Daniel L. Houlihan as attorney for plaintiff-appellee. Houlihan did not sign the notice of appeal nor did he at any time file a notice of appeal for the applicants. Houlihan has contended on appeal that the notice of appeal was for all parties. However, we cannot agree. Supreme Court Rule 303(c)(3) (Ill. Rev. Stat. 1977, ch. 110A, par. 303(c)(3)) requires that the notice of appeal contain the signature and address of each appellant or his attorney. The notice of appeal contained the signature neither of the applicants nor of their attorney. Furthermore, a copy of the notice was sent to Houlihan as attorney for plaintiff-appellee. This clearly indicates that Houlihan's clients were not considered by the appellants as part of the class of defendants and according to the notice of appeal it was "the defendants, Zoning Board of Appeals, et al." that were appealing. Since the filing of a notice of appeal is jurisdictional (*Texaco, Inc. v. Barnes* (1978), 60 Ill. App. 3d 696, 377 N.E.2d 187), and the applicants never filed a notice of appeal, we agree with the objectors that their brief must be stricken.

The objectors further contend that the zoning board of appeals has no standing to appeal from the circuit court's reversal of the zoning board's decision. Obviously if the zoning board has no standing to appeal, this court has no jurisdiction over this case since, as we already ruled, the applicants, having failed to appeal, are barred from seeking review of the trial court's decision.

This State has not directly passed on the issue whether a zoning board of appeals has standing to appeal from a reversal of its own decision, although we note that in *Cosmopolitan National Bank v. Zoning Board of Appeals* (1978), 63 Ill. App. 3d 926, 380 N.E.2d 940, a case was considered by the appellate court upon appeal by the zoning board of appeals, the question of standing apparently not having been raised by the parties. This question has been addressed in other States, however, with differing results.

A slight majority of the States that have addressed this issue have held that a zoning board of appeals or similar body has no standing to appeal a reversal of its own decision since it exercises quasi-judicial functions, has no interest in the proceeding other than to decide the case fairly and impartially and therefore is not aggrieved by the decision. (See, for example, *Miles v. McKinney* (1938), 174 Md. 551, 199 A. 540; *Board of Adjustment v. Kuehn* (1955), 132 Col. 348, 290 P.2d 1114; *A. Di Cillo &*

*Sons, Inc. v. Chester Zoning Board of Appeals* (1952), 158 Ohio St. 302, 109 N.E.2d 8; *Hassell v. Zoning Board of Review* (1971), 108 R.I. 349, 275 A.2d 646; *Appeal of Board of Adjustment* (1934), 313 Pa. 523, 170 A. 867; *Robert Louis Corp. v. Board of Adjustment* (1971), 1 Pa. Cmwlth. 292, 274 A.2d 551; *State ex rel. Bringhurst v. Zoning Board of Appeal & Adjustment* (1941), 198 La. 758, 4 So. 2d 820; *River Oaks-Hyman Place Homeowners Civic Association v. City of New Orleans* (La. App. 1973), 281 So. 2d 293; *Gilliam v. Etheridge* (1942), 67 Ga. App. 731, 21 S.E.2d 556, and compare *Minnesota Water Resources Board v. County of Traverse* (1970), 287 Minn. 130, 177 N.W.2d 44.) A few cases (see, for example, *Borough of Hasbrouck Heights v. Division of Tax Appeals* (1958), 48 N.J. Super. 328, 137 A.2d 585; *Altman v. School Committee* (1975), 115 R.I. 399, 347 A.2d 37), none of which were zoning cases, have indicated that an exception to the rule of no standing would lie where (1) there would otherwise be no adversary because the agency was prosecutor as well as judge or (2) where the interest of the public in the litigation reaches out *decidedly* beyond that of the immediate parties and in connection with which the agency has a general public duty to perform. Neither of these exceptions would be applicable here.

Finally, certain courts, recognizing that the agency is not merely quasi-judicial but that the agency actively represents the public interest, have held that the board has standing to appeal a reversal of its decision. (*Rommell v. Walsh* (1940), 127 Conn. 16, 15 A.2d 6; *Zoning Board of Adjustment v. Dragon Run Terrace, Inc.* (1965), 59 Del. 75, 216 A.2d 146; *Board of Adjustment v. Stovall* (1949), 147 Tex. 366, 216 S.W.2d 171; *Cunningham v. Leimkuehler* (Mo. App. 1955), 276 S.W.2d 633; *Corbett v. Zoning Board of Appeals* (1954), 283 App. Div. 282, 128 N.Y.S.2d 12.) As was stated in *Rommell v. Walsh* (1940), 127 Conn. 16, 21-22, 15 A.2d 6, 9:

> "In some appeals from administrative boards the question at issue is of consequence only to certain parties who will be directly affected, as, for example, where the public utilities commission is called upon to apportion between a municipality and a railway company the cost of the construction of a highway bridge over a railway track. Norwalk v. Connecticut Co., 88 Conn. 471, 91 A. 442. In proceedings for the assessment of benefits and damages, the parties directly concerned are the property owners affected and the municipality which must bear the expense of the public improvement. In other cases, however, there is a definite public interest to be protected. This is true, for instance, of many orders of the public utilities commission, and is particularly true with respect to zoning regulations. In appeals of this type, the public interest should be represented. In appeals in zoning cases the municipality might no doubt properly do this. However, under

most, if not all, of our municipal charters, the function of protecting and advancing the public interest in establishing and maintaining a proper and adequate zoning system is entrusted to certain boards, which, in that respect, exercise a large discretion. While these boards have ordinarily no corporate existence as such but are merely agencies of the municipality, and while they have no direct interest in the litigation, it would be a logical conclusion that because of the function they perform they should represent the public interests entrusted to them in appeals taken from their decisions.

Administrative boards differ radically from courts because frequently in the performance of their duties they are representing such interests, whereas courts are concerned with litigating the rights of parties with adverse interests who appear before them. Appeals taken from decisions of such boards are in a very different category than are appeals taken from a lower to a higher court, where the lower court, having acted, ceases to have any interest in the controversy, direct or representative. An appeal from an administrative board is not the means by which jurisdiction of a cause is transferred from one tribunal to another, but is a process by which a court may be called upon, not to substitute its judgment for that of the board, but to determine whether the latter has acted legally and in a proper exercise of the discretion vested in it."

In *Board of Adjustment v. Stovall,* the board of adjustment had granted a permit to build a nonconforming use, just as the zoning board in the present case granted a permit for a special use. In that case, as in ours, the trial court reversed the order. The Texas Supreme Court, in finding that the board of adjustment had standing to appeal, stated at 147 Tex. 366, 371, 216 S.W.2d 171, 173:

"In determining whether a permit applied for under the quoted ordinance shall be granted or denied, the board is engaged in a delegated policy-making function, and it is not merely adjudicating private rights. The functions of the Board of Adjustment are an integral part of the system of zoning regulations. In order that zoning may work fairly, the zoning ordinance authorizes the granting of permits for variances, and the determination of the question whether such permits shall be granted or denied is an essential part of the proper administration of the zoning ordinance. The public, as well as the affected private parties, has an interest in upholding the order of the Board if it is valid, and the Board itself is the proper party to represent this public interest where its order is under review. In these respects the functions of the Board of Adjustment are analogous to the action of the Railroad Commis-

sion in granting or denying drilling permits as exceptions to Rule 37. While in those cases, as in the case now before us, private property rights are involved in the granting or refusal of permits, the Commission's action also has an important bearing on the whole scheme of conservation regulations."

■■ We are persuaded by the reasoning in *Rommell* and *Stovall* that the zoning board has standing here to represent the public interest, particularly where, as here, the original applicant either cannot or no longer is interested in pressing its claim. Accordingly we hold that the zoning board's appeal is properly before us.

## II.

The zoning board's first contention is that although it granted the applicants a special use, this was really unnecessary because the projected slaughterhouse operation was in fact a continuing nonconforming use. It is clear, however, from the record that this contention has been waived by the applicants' abandonment of this issue before the board. (*Bethune Plaza, Inc. v. State of Illinois Department of Public Aid* (1980), 90 Ill. App. 3d 1133, 414 N.E.2d 183.) The applicants filed an application for a permit to expand and modernize the existing premises. The premises had been operated as a slaughterhouse from 1908 to about 1965 and had enjoyed the status of a legal nonconforming use. After about 1965 no slaughtering occurred on the premises which were used only for processing. This application was denied by the zoning administrator. At that point the applicants had two options. They could have appealed the adverse decision of the zoning administrator or they could have filed an application for a variation in the nature of a special use. The applicants took the latter route. When asked at the hearing:

"Chairman Guthman: Yes, but you, as a lawyer * * * decide whether you are going to a Special [Use] or just whether you are appealing—

Mr. Houlihan: I'm filing here for a Special Use. * * *.

Chairman Guthman: You are not suggesting here that we should decide this on the narrower ground of an appeal?

Mr. Houlihan: No I am not. I'm asking you to decide on the application for Special Use.

Chairman Guthman: That is what your case rests on? As you know, that's a much more burdensome task than the appeal route."

■■ Because the applicants clearly chose not to follow the appeal route, and indeed did not produce any evidence to refute the zoning administrator's determination, the zoning board of appeals made no finding whether there was a legal nonconforming use. The board itself recognized this in the circuit court where it stated that the applicants were

trying to raise an issue (that of nonconforming use) which was not before the court because it was not part of the record of the zoning board of appeals. Having chosen to abandon any right to seek a reversal of the zoning administrator's findings, neither the applicant nor the board can resurrect that right at this late date.

## III.

After hearing the evidence the zoning board of appeals issued its decision. The board first summarized the history and nature of the site as follows: The property is located partly in an M1-2 Restricted Manufacturing District and partly in an M2-2 General Manufacturing District. The building on the site is a one-purpose building, having been used as a cattle-slaughtering plant from 1908 to 1965 and thereafter used for boning and processing livestock carcasses and for rendering. On December 20, 1956, the board of appeals of the city of Chicago granted a variation to permit the erection of a two-story brick addition to the west side of the existing slaughtering plant. On October 26, 1965, the board sustained an appeal authorizing the issuance of a certificate of occupancy for a slaughtering house in the building on the site. The present owner, who is experienced in the meat packing business, including slaughtering, purchased the building on the site and the business of the Illinois Meat Company. The owner proposes to reestablish a slaughtering plant in the premises and to erect an addition to the existing building.

The board found that the proof supported the following findings concerning the proposed use:

1. It is necessary for the public convenience because the facility was built for the slaughtering of animals and for meat packing and is not readily adaptable to other manufacturing uses;

2. It will be designed, located and operated in such a manner that the public health, safety and welfare will be protected. This will be assured because the proposed use is subject to the approval and regulation of the City of Chicago Department of Environmental Control, the Illinois Environmental Protection Agency, the U.S. Department of Agriculture, and the Chicago Metropolitan Sanitary District;

3. It will not cause substantial injury to the value of other property in the neighborhood because the building is a one purpose building bounded on three sides by M1 and M2 zoning districts and it will be renovated and entirely closed and screened from any adjoining property;

4. It will not affect the property of American Meat Packing Corporation, located at 43rd and Racine; that company's objection is based merely upon a desire to avoid possible competition.

Accordingly the board approved the application for a special use and authorized the zoning administrator to permit "the establishment of a meat packing plant including slaughtering, rendering, cutting and boning facilities, in the one and two-story brick building, and the erection of a one and two-story addition, approximately 24,000 square feet, to the south side thereof, on premises at 1107-53 W. 47th Place and 1100-48 W. 48th Street." However, this authorization was conditioned on the following requirements:

"1. All activities, including the holding [*sic*] and unloading of trucks must be performed on site;

2. Trucks shall not be permitted to await unloading except on the subject premises;

3. The fencing to be installed to enclose the premises must be set back three feet from the property line on all sides directly adjoining or across the street from residential improvements;

4. The area between the property line and the fencing must be planted with a dense compact hedge, not less than five nor more than seven feet in height;

5. The hours of operation must be limited to between 6:00 a.m. and 4:00 p.m., Mondays through Fridays;

6. Before a permit is issued all statutory provisions and all applicable ordinances of the City of Chicago must be complied with;

7. Use of the premises must be in compliance with the requirements of the Department of Environmental Control of the City of Chicago, the U.S. Department of Agriculture, the Illinois Environmental Protection Agency, and the Metropolitan Sanitary District of Chicago."

Section 11.10—4 of the Chicago Zoning Ordinance (Chicago Municipal Code, ch. 194A, §11.10—4) provides:

"11.10—4. Standards. No special use shall be granted by the Zoning Board of Appeals unless the special use:

(1) a. Is necessary for the public convenience at that location;

b. Is so designed, located and proposed to be operated that the public health, safety and welfare will be protected; and

(2) Will not cause substantial injury to the value of other property in the neighborhood in which it is to be located; and

(3) It is within the provisions of 'Special Uses' as set forth in rectangular boxes appearing in Articles 7, 8, 9, and 10; and

(4) Such special use shall conform to the applicable regulations of the district in which it is to be located."

Other sections set forth performance regulations concerning noise, vibration, smoke, glare, heat, fire hazards, explosive hazards, and toxic, particulate and odorous matters (Municipal Code of Chicago, ch. 194A, §§10.5—10.11—2); many of these regulations provide detailed guidelines as to the maximum permitted in any given area.

On appeal, after reviewing the record and hearing the arguments of counsel, the circuit court ruled that:

1. The finding that the special use is necessary for the public convenience is supported by the record;

2. With respect to section 11.10—4(1)(b), the applicant's proof failed to support the board's finding that the proposed use is so designed, located and proposed to be operated that the public health, safety and welfare will be protected; in fact the applicant introduced no evidence as to how the particular plant would operate;

3. With respect to section 11.10—4(2), the finding that the proposed use will not cause substantial injury to the value of other property in the neighborhood is clearly wrong and contrary to the manifest weight of the evidence;

4. With respect to section 11.10—4(4), the applicant introduced no evidence and the board made no findings that the proposed use would comply with the performance standards applicable to uses in manufacturing districts;

5. The decision of the board is inadequate because it fails to sufficiently set forth the findings of the board with respect to the standards set forth in the zoning ordinance and the decision is obviously and clearly wrong because it is without foundation in the evidence and does not recite the necessary components provided for in the zoning ordinance;

6. With respect to offstreet parking, the record establishes that the proposed use will not comply with the requirements of the zoning ordinance in this regard.

■■ It is well established that specific findings of fact and reasons are required when an application for a special use is granted. (Ill. Rev. Stat. 1977, ch. 24, par. 11—13—11; *International Harvester Co. v. Zoning Board of Appeals* (1963), 43 Ill. App. 2d 440, 193 N.E.2d 856.) Accordingly, if proper findings are not made as to the required standards or if the reasons given by the board do not support the findings set out, then the order must be reversed. *International Harvester Co. v. Zoning Board of Appeals* (1963), 43 Ill. App. 2d 440, 193 N.E.2d 856.

It is equally well established in Illinois that an applicant for a special use has the burden of proving that the proposed use will meet all of the standards required by the ordinance. (*Cosmopolitan National Bank v. Zoning Board of Appeals* (1978), 63 Ill. App. 3d 926, 380 N.E.2d 940; *Mile Square Service Corp. v. City of Chicago Zoning Board of Appeals* (1976), 42 Ill. App. 3d 849, 356 N.E.2d 971; *International Harvester Co. v. Zoning Board of Appeals* (1963), 43 Ill. App. 2d 440, 193 N.E.2d 856; *Allen v. Board of Appeals* (1969), 118 Ill. App. 2d 376, 254 N.E.2d 840.) Among these standards are the regulations as to matters such as odors, noise previously referred to.

The circuit court was clearly correct in holding that the board made no findings as to compliance with these performance requirements. Likewise a reading of the record discloses that the applicants produced no evidence tending to show compliance with these standards and the board, on appeal, does not contend that they did. Rather the board contends that the performance standards cannot realistically be conditions precedent but can only operate as conditions subsequent and it was sufficient that the evidence showed and the board found that the plant would be subject to comprehensive Federal and State regulation.

Ochylski, the beneficial owner of the property, testified that there were probably six United States Government inspectors on the premises all day long and if there was any evidence of rodents in a plant, the United States Government would shut it down immediately. The same was true as to obnoxious odors. He admitted that he could not guarantee that noise would not be a condition attendant to the operation. Ernest Kopp, a professional engineer, testified that before any construction or production is commenced, the proposed processes, equipment and operation must first be approved by the department of buildings of the City of Chicago, the Metropolitan Sanitary District, the Illinois Environmental Protection Agency and the United States Department of Agriculture. The Illinois Environmental Protection Agency, he said, requires the packer to show how odors are to be controlled.

Karl Franson, an environmental protection engineer employed by the air pollution division of the Illinois Environmental Protection Agency, testified that meat packing plants must comply with State environmental regulations and must operate free from objectionable odor nuisance. The agency enforces the law by surveillance and by its permit system. Surveillance engineers of the agency routinely inspect all sources of pollution in the State. The agency also relies heavily on citizens' complaints. Only one complaint is necessary to generate activity on the part of the agency. When violations occur, the agency ordinarily files a complaint with the Illinois Pollution Control Board. However if there is an emer-

gency, the agency can obtain injunctive relief through the office of the Illinois Attorney General.

Wolfgang Krol, supervisor of meat packing operations for the United States Department of Agriculture in northern Illinois, testified that before a blueprint for a slaughterhouse is approved five points must be established:

> 1. Normal sanitation within Federal regulations must appear from the blueprints;
> 2. Approved water must be available on the site;
> 3. Approval of sewage facilities by the pertinent local authority;
> 4. Issuance of a permit by the State veterinarian for removal of inedible and diseased animal matters;
> 5. Finding by the Environmental Protection Agency that the place is in compliance with environmental regulations.

Krol testified "we will not take a very small plant since we do not have the manpower available; the plant has to be large enough in size so that we can make people available." He further testified that he was not familiar with the proposed plant but, assuming it was of the proper size, the department would have livestock inspectors, food inspectors, supervisory personnel and veterinarians and medical officers inside in charge of the plant. If the plant was not in sanitary condition, "the operation would not start."

Krol also testified that the department was required by law to provide inspection to everyone who asked for it. The Federal budget was short, and it had shortages in personnel, but it would make every effort in case an establishment came in if it had enough time to provide necessary inspections as a result of the request.

The board refused to allow testimony by an expert witness for the objectors that the Illinois Environmental Protection Agency's standards are less stringent than those of the City of Chicago.

■■ As already noted, it is clear from the evidence that the applicants did not prove that they would comply with the performance standards set forth in the Chicago ordinance. Furthermore, while there was evidence as to regulation by various Federal and State agencies, there was absolutely no evidence that such regulations were as stringent as those enacted by the City of Chicago. Thus even if we could assume that the evidence was sufficient to show, *a priori*, that the operations were designed so as to conform to the Federal and State requirements, we could not infer from this that the operation would also conform to the applicable regulation of the district.

Furthermore, we cannot agree with the board that this requirement is merely a condition subsequent permitting the plant to be closed down

should it be found in violation. Precisely this same question was considered and answered in *International Harvester Co. v. Zoning Board of Appeals* (1963), 43 Ill. App. 2d 440, 450, 193 N.E.2d 856, 861, which stated:

"We turn now to the issue of whether an application for a special use must show that the proposed use will meet the performance standards required by the ordinance for the district in which the special use is to be located. * * *

The zoning board, * * * made no finding in reference to these standards—in fact its decision did not mention them at all and the comments of the chairman, during the course of the hearing, suggest that the board did not consider them as being conditions precedent to the granting of a special use permit.

The performance standards are intricate and confusing and proof of intended compliance would obviously be difficult; nevertheless, a careful study of the ordinance leads to the ineluctable conclusion that these standards were meant to be conditions precedent as well as subsequent. They are conditions precedent in that there must be a satisfactory showing by the applicant that the proposed use will conform with these standards before the permit is granted. They are conditions subsequent in that the use, if granted, must continue to observe these standards and the applicant may be penalized if violations occur."

■■ Indeed, this is the only reasonable result. The ordinance permits the establishment in an area such as the one present of junkyards, slaughterhouses, garbage dumps, automobile driveins and fairgrounds as special uses. Any one of these obviously could be obnoxious to its neighbors if not properly operated. The city, while permitting their establishment, has drawn up strict standards to prevent any danger of the uses harming the neighbors' use and enjoyment of their property and has sought to guarantee the neighbors' continued enjoyment of their property by insisting that the special use cannot be established until it has been shown that the proposed use will be so operated as to conform with the standards laid down and will not, otherwise, injure the public health, safety and welfare and will not cause substantial injury to the value of the neighboring property. The neighbors will not be adequately protected, and the intent of the ordinance will not be carried out if the neighbors' remedy is limited to their being able to seek to enjoin the continued operation of the special use after they have already been injured by its use. We are aware that normally a business is not closed down the instant it violates an ordinance or statute; legal proceedings take time. Nor is there any guarantee that a court or governmental agency would force the closing of the plant even if it were in violation; the assessment of penalties is a common remedy, and agencies have been known to modify or waive regulations. The only way

the neighbors can be assured of future protection is by (1) demanding that the applicant show that he can conform with the requirements and specifically how he intends to do so and (2) by seeking incorporation of this plan as part of the order concerning requirements for continued operation of the plant.

■■ The board also argues that the ordinances were enacted before the enactment of Federal, State and city environmental laws. However, if the city believed that the ordinances in question are no longer relevant or needed, it is for the city to repeal them and not for this court to do so. And we note that although over 15 years have passed since *International Harvester*, the city has not amended the ordinance to remove its condition precedent effect.

It is clear therefore that the circuit court correctly ruled in paragraph 4 that the applicants introduced no evidence and the board made no findings that the proposed use would comply with the performance standard applicable to uses in manufacturing districts. For the same reason we agree that the board's finding with respect to section 11.10—4 (1)(b) was improper. While we do not agree with the circuit court that the applicants introduced no evidence as to how the particular plant would operate, we do not believe that the zoning board can shrug off its responsibility to hear and consider the evidence and make its own determination as to whether the use *is* so designed, located and proposed to be operated that the public health, safety and welfare will be protected by simply saying that the operation is regulated by other agencies.

■■ The circuit court also ruled, with respect to section 11.10—4(2), that the finding that the proposed use will not cause substantial injury to the value of other property in the neighborhood was contrary to the manifest weight of the evidence. The applicant introduced evidence that the use would not reduce property values; the objectors introduced evidence that it would. Normally it is for the agency, not the reviewing court, to weigh the evidence. (*Dugan's Bistro, Inc. v. Daley* (1977), 56 Ill. App. 3d 463, 371 N.E.2d 1116.) However, here the finding cannot stand, because the only reasons given for the finding, namely that (1) the building is a one-purpose building; (2) it is bounded on three sides by M1 and M2 zoning districts; (3) the area will be entirely closed and screened from any adjoining property, are insufficient. Obviously the fact the building is a one-purpose building does not prove that its operation will not cause substantial injury to the value of other property. It may have been utilized in the past as a slaughterhouse, but other buildings in the area equally have been used as residences over a long period of time. Indeed the community was led to believe in the 1960's that the building would never again be rezoned for a slaughterhouse or a rendering plant. Likewise the fact that the property is bounded on three sides by M1 and M2 zoning

districts does not permit the board to totally ignore the neighboring residences, either those existing as legal nonconforming uses or those in the area zoned residential, residences described by one member of the board as "some of the nicest in that neighborhood and * * * obviously the freshest and spanking clean." Finally, while a hedge buffer may block visibility, it cannot affect odor or noise pollution, and as we have already noted, the board has failed properly to address those issues.

Finally, the circuit court ruled that the evidence failed to show that the proposed use will comply with the offstreet parking requirements. Section 10.16—1, 2 of the zoning ordinance requires that there be one parking space for each four employees, based on the maximum number of employees on duty or residing or both on the premises at one time plus one space for each vehicle used in the business. There was testimony that there were 70 spaces for employee parking as well as open space for trucks. On the other hand, there was testimony that because of the smallness of the site there was room for only three on-site trucks at one time without interfering with employee parking or blocking other traffic. Ochylski testified that he expected initially to have a work force of 125 persons but expected eventually to have a total of 300-350 employees. It is unnecessary for us to decide which figure should be considered, since the board in its findings did not make any findings as to the adequacy of parking facilities. Nor did the board in its order limit the acceptable work force to 280 (the maximum permitted if there are in fact 70 parking spaces). Certainly we cannot assume absent such findings that the parking space is adequate particularly in light of the fact that the board ordered that all loading and unloading occur on the site, which must inevitably reduce the amount of space available for parking.

■■ The circuit court simply reversed and set aside the order of the zoning board. However, we believe that while the reversal was proper, since the legislature has delegated the decision making to the agency and this is a matter of public interest, the better remedy is to remand the case to the board for further proceedings in accordance with this opinion. 2 Davis, Administrative Law Treatise §16.14 (1958).

Vacated and remanded to the zoning board of appeals.

LINN, P. J., and JIGANTI, J., concur.